No. 26-4014

## In the United States Court of Appeals
## for the Tenth Circuit

Phil Lyman,
*Appellant,*

v.

Deidre M. Henderson,
in her official capacity as Lieutenant Governor
of the State of Utah,
*Appellee.*

On appeal from the U.S. District Court for the District of Utah
No. 4:25-CV-00069, Honorable David O. Nuffer

## Appellee's Principal Brief

Derek Brown
Utah Attorney General
Erin T. Middleton
Deputy Solicitor General
Lance Sorenson
Assistant Attorney General
160 East 300 South, Fifth Floor
P.O. Box 140858
Salt Lake City, Utah 84114
(801) 366-0533
emiddleton@agutah.gov
lancesorenson@agutah.gov
*Counsel for Appellee*

**Oral Argument Not Requested**

## Table of Contents

Introduction ....................................................................................... 1

Statement of Jurisdiction ................................................................. 2

Statement of the Issues ................................................................... 2

Statement of the Case ..................................................................... 3

Summary of Argument .................................................................. 11

Argument ....................................................................................... 14

I.    Mr. Lyman's unpled candidacy is irrelevant. .............................. 16

    A.    Mr. Lyman failed to plead he was a candidate. ................... 16

    B.    Mr. Lyman does not have standing under *Bost*. ................... 21

II.   Mr. Lyman must plead more than a statutory violation
    or "informational injury" to have standing assert an
    NVRA claim. ........................................................................... 22

    A.    Statutory violations do not automatically confer
        standing. ........................................................................... 23

    B.    An alleged informational injury, on its own, is not
        an injury in fact. ............................................................... 25

        1.    An alleged informational injury must be
            accompanied by downstream consequences. ............... 26

        2.    *TransUnion* and *Looper* extend to
            informational injuries under the NVRA. ...................... 29

        3.    Pre-*TransUnion* cases do not dictate a
            different result. ........................................................... 31

            a.    *Looper* rejected Mr. Lyman's argument
                that the pre-*TransUnion* cases excuse
                him from pleading downstream
                consequences. ..................................................... 32

            b.    Downstream consequences are required
                even in public disclosure cases. ........................... 38

ii

III.   Mr. Lyman has not alleged downstream consequences. ............... 48

IV.   This Court should not address the merits of Mr.
      Lyman's NVRA challenges in the first instance. .......................... 61

Conclusion ................................................................................................. 62

Addendum

      A. Memorandum Decision and Order Granting Defendant
      Lieutenant Governor Deidre Henderson's Motion to Dismiss
      Pursuant to Fed. R. Civ. P. 12(B)(1)

      B. Judgment, Case No. 4:25-cv-00069-DN-PK

# Table of Authorities

**Cases**

*1789 Found., Inc. v. Schmidt,*
  781 F. Supp.3d 282 (M.D. Pa 2025)......................................................56

*Allen v. Wright,*
  468 U.S. 737 (1984) ............................................................................55

*Baker v. U.S.D. 229 Blue Valley,*
  979 F.3d 866 (10th Cir. 2020)......................................................15, 52

*Bost v. Ill. State of Elections,*
  607 U.S. 71 (2026)...............................16, 20, 21, 22, 51, 52, 57

*California v. Texas,*
  593 U.S. 659 (2021) ............................................................................19

*Campaign Legal Center v. Scott,*
  49 F.4th 931 (5th Cir. 2022) .......................30, 39, 40, 41, 42, 46, 50, 53

*Colorado Outfitters Ass'n v. Hickenlooper,*
  823 F.3d 537 (10th Cir. 2016)............................................................48

*DeWilde v. Attorney General of United States,*
  No. 23-8054, 2024 WL 1550708 (10th Cir. April 10, 2024)................52

*FEC v. Akins,*
  524 U.S. 11 (1998) .......................................................................32-43, 53

*Griffen v. Dep't of Labor Fed. Credit Union,*
  912 F.3d 649 (4th Cir. 2019)..............................................................35

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) .................................................................32, 36, 37

*Judicial Watch, Inc. v. Griswold,*
  No. 20-cv-02992, 2022 WL 3681986 (D. Colo. Aug. 25, 2022).............47

*Judicial Watch, Inc. v. King,*
  993 F. Supp. 2d 919 (S.D. Ind. 2012) ................................................46

*Judicial Watch, Inc. v. Griswold,*
  554 F. Supp. 3d 1091 (D. Colo. 2021) ...........................................56, 57

*Lance v. Coffman,*
  549 U.S. 437 (2007) ..................................................................56

*Laufer v. Looper,*
  22 F.4th 871 (10th Cir. 2022) ..... 9, 13, 15, 24, 26-29, 31, 32, 34-38, 42,
  44, 46-48, 51, 53, 54

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ........................................................15, 26, 54

*Marlyand Election Integrity, LLC v. Maryland State*
    *Bd. of Election,*
  127 F.4th 534 (4th Cir. 2025) .............................................56

*Pac. Frontier v. Pleasant Grove City,*
  414 F.3d 1221 (10th Cir. 2005)...........................................61

*Petrella v. Brownback,*
  697 F.3d 1285 (10th Cir. 2012)...........................................15

*Project Vote/Voting for Am., Inc. v. Long,*
  752 F. Supp. 2d 697 (E.D. Va. 2010) ...................................46

*Pub. Int. Legal Found v. Bellows,*
  92 F.4th 36 (1st Cir. 2024)...................................................43

*Pub. Int. Legal Found. Inc. v. Nago,*
  174 F.4th 664 (9th Cir. 2026) .......................................43, 44

*Pub. Int. Legal Found. v. Bennett,*
  Civ. Action No. H-18-0981, 2019 WL 1116193 (S.D. Tex.,
  Feb. 6, 2019) ........................................................................46

*Public Citizen v. Department of Justice,*
  491 U.S. 440 (1989).................................................31-43, 59

*Public Interest Legal Foundation Inc. v. Fontes,*
  816 F. Supp. 3d 984 (D. Az. 2026) ...............................58, 59

*Public Interest Legal Foundation v. Benson*,
136 F.4th 613 (6th Cir. 2025) ..................................................31, 41, 42

*Public Interest Legal Foundation v. Secretary
Commonwealth of Pennsylvania*,
136 F.4th 456 (3d Cir. 2025).......................................30, 32, 42, 44, 52

*Rio Grande Found. v. Oliver*,
57 F.4th 1147 (10th Cir. 2023) ...........................................................17

*Southern Utah Wilderness Alliance v. Palma*,
707 F.3d 1143 (10th Cir. 2013)...........................................................17

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)......................................................... 15, 21, 24, 26

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ............................................................................26

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)......................................9, 13, 24-32, 34, 35, 37-47

*Trichell v. Midland Credit Management., Inc.*,
964 F.3d 990 (11th Cir. 2020)..................................................39, 40, 41

*United States v. Leffler*,
942 F.3d 1192 (10th Cir. 2019)..................................................... 19, 20

*United States v. Marcus*,
560 U.S. 258 (2010) ............................................................................20

*Voter Reference Found., LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025) ............................23, 29, 57, 58, 61, 62

*Zivotofsky v. Sec'y of State*,
444 F.3d 614 (D.C. Cir. 2006) ............................................................46

**Statutes**

52 U.S.C. § 552.................................................................................45

52 U.S.C. § 20507...........................................................................23

52 U.S.C. § 20510.......................................................................23, 45

Utah Code § 20A-2-104 (2025) ...............................................3, 4, 5, 6, 19

Utah Code § 20A-2-601 (2026) .............................................................10

Utah Code § 20A-2-602 (2026) .............................................................10

Utah Code § 20A-2-603 (2026) ........................................................ 10, 11

Utah Code § 20A-2-606 (2026) .............................................................11

Utah Code § 63G-2-202 .....................................................................55

Utah Code § 63G-2-203 .....................................................................10

Utah Code § 63G-2-302 (2025) ..............................................................4

Utah Code § 63G-2-302 (2026) ..............................................................4

**Rules**

10th Cir. R. 28.1(A)..........................................................................18

## Statement of Prior or Related Appeals

There are no prior or related appeals in this case.

## Introduction

Mr. Lyman filed this litigation to challenge the Utah Lieutenant Governor's refusal to disclose the portions of Utah's voter registration list that are not public under Utah's Election Code, including data about voters who are the victims of domestic violence or members of law enforcement or the armed services. He claims he is entitled to such data about Utah's most vulnerable voters under the National Voter Registration Act of 1993 (NVRA).

Mr. Lyman lacks standing to ask the federal courts to resolve this dispute. To invoke Article III jurisdiction, he must allege he suffered an injury in fact that is both concrete and particular to him. Merely alleging a statute has been violated does not amount to such an injury. Nor does claiming an "informational injury" because he did not get the information he demanded. To seek relief from the federal courts, Mr. Lyman must also plead concrete and particular downstream consequences from that denial.

There are no downstream consequences here. Mr. Lyman filed his complaint as a voter who wanted the requested information to personally ensure that Utah is following the law. But becoming a self-

appointed legal compliance monitor is not a concrete and particular injury to Mr. Lyman or any other voter. All citizens are equally interested in having a government that follows the law. Mr. Lyman cannot salvage his complaint by arguing—for the first time on appeal—that he has standing as a candidate. He was not a candidate when he filed his complaint and did not plead any injuries related to his current or any prior candidacy. The district court properly dismissed the complaint, and this Court should affirm.

## Statement of Jurisdiction

Apart from the arguments made about standing in this brief, the Lieutenant Governor does not dispute Mr. Lyman's statement of jurisdiction.

## Statement of the Issues

**1.** Whether Mr. Lyman has standing as a candidate for elected office to challenge the Lieutenant Governor's denial of his records request when he was not a candidate when he filed his complaint and did not plead any injuries related to any past or future candidacy.

*Preservation*: Mr. Lyman did not preserve this issue, and the district court did not rule on it.

**2.** Whether the district court correctly held that Mr. Lyman must plead that the denial of his records request caused him to suffer downstream consequences to satisfy Article III's injury in fact requirement.

*Preservation*: This issue was raised to the district court, App. 26-36, 53-63,[1] and the court addressed it, App. 96-112.

**3.** Whether the district court correctly held that Mr. Lyman failed to plead any downstream consequences from the denial of his records request.

*Preservation*: This issue was raised to the district court, App. 26-36, 60-63, and the court addressed it, App. 101, 111-112.

## Statement of the Case

### Utah's Election Laws

Utah's Election Code governs access to Utah's statewide voter registration records. Utah Code § 20A-2-104(2025).[2] Many of those

---

[1] Citations to Mr. Lyman's appendix are cited as "App. page number."

[2] The Utah Legislature substantially amended its Election Code during the 2026 General Session. Unless otherwise noted, this brief cites to the 2025 version that applied when Mr. Lyman filed his complaint.

3

records are publicly available and can be requested from the Utah Lieutenant Governor's Office. *Id.* § 20A-2-104(2)(a), (3)(d) (2025); App. 10. When Mr. Lyman filed his complaint, Utah's Election Code required the Lieutenant Governor to treat as private voter records that had been designated as "private" or "withheld." Utah Code § 20A-2-104(4)(h)(i) (2025). It also protected, and still protects, year of birth information from disclosure. Utah Code § 63G-2-302(1)(j) (2025); *see also* Utah Code § 63G-2-302(1)(j)-(n) (2026).

### *Private Records*

Before March 9, 2026, any registered voter could request to designate their voter registration as "private." Utah Code § 20A-2-104(4)(h) (2025). Registrations designated as "private" were not available to the public. *Id.*; *see also id.* § 63G-2-201(5). As relevant here, only two categories of individuals could access them: (1) a government official or employee acting in their official capacity; and (2) statutorily designated persons who are requesting them for a political purpose. Utah Code § 20A-2-104(4)(a)(v)-(vi) (2025); *id.* § 20A-2-104(d)(ii) (2025). Those statutorily specified persons were limited to "a political party" (including its agents, employees, or contractors) or a candidate for

4

public office (including a candidate's employees, independent contractors, or volunteers). *Id.* § 20A-2-104(4)(a)(v), (vi) (2025).

### *Withheld Records*

Before May 9, 2026, certain voters could also request to have their voter registration information classified as "withheld," a more protected category than "private." To be eligible, the voter had to show that either the voter or a member of their household was (1) a victim of domestic abuse; (2) a law enforcement officer; (3) a member of the armed forces; (4) a public figure; or (5) protected by a protective order or protection order." Utah Code § 20A-2-104(1)(e)(i)-(ii) (2025).

In addition, some voters were eligible to have their records designated as "withheld" if their "voter registration record was classified as private record" at the voter's request "before May 12, 2020." *Id.* 20A-2-104(1)(e)(iii) (2025). Mr. Lyman alleges that this category of records was "wrongfully classified" as withheld because those voters do not necessarily fall within one of the other categories designated for protection. App. 12.

The Lieutenant Governor cannot disclose withheld records to the public, including to the qualified political parties and candidates who can access private records. Utah Code § 20A-2-104(2)(a) (2025).

### *Year of Birth Data*

In addition, before May 2026, Utah law prohibited the disclosure of all voters' dates of birth, but allowed defined "qualified persons," including political parties and candidates, to obtain a voter's year of birth under certain conditions. Utah Code § 20A-2-104(4)(f) (2025).

### *Mr. Lyman Requests Voter Information*

In September 2024, Plaintiff Phil Lyman requested "a copy of the statewide voter registration database, including data for voters classified as Private and Withheld." App. 14. He also requested access to every voter's "year of birth information." *Id.* at 20. Although Utah law restricted Mr. Lyman's access to such records, he asserted he was entitled to them under the National Voter Registration Act (NVRA). App. 16-17.

The Lieutenant Governor directed Mr. Lyman to her office's website for access to the public version of the voter registration list. App. 14-15. But she declined to disclose the portions designated as

"private" or "withheld" because state law did not give her "discretion to ignore" the statute and "provide unrestricted access" to the voter rolls. App. 15.

Mr. Lyman, through his newly retained counsel, the Public Interest Legal Foundation (PILF), sent a letter to the Lieutenant Governor accusing her of violating the NVRA by failing to permit inspection of the records and giving her 90 days to provide Mr. Lyman with the information. App. 6. When she did not provide the records classified as private and withheld, Mr. Lyman filed this lawsuit.

### *The Litigation*

Mr. Lyman sued the Lieutenant Governor in her official capacity. App. 9. He alleged that the Lieutenant Governor had wrongfully denied access to (1) private voter records; (2) voter records improperly classified as "withheld"; and (3) year of birth information for public and private voter records. App. 16-21. According to Mr. Lyman, the NVRA preempted Utah's Election Code and gave him a right to the information. App. 9-13. He requested a declaration that the Lieutenant Governor had violated the NVRA by "refusing to allow Mr. Lyman to inspect and copy" the Statewide Voter Registration List and for an

7

injunction ordering her to "produce to Mr. Lyman the full and complete Statewide Voter Registration List" and enjoining her from denying his future requests. App. 21.

Mr. Lyman brought the complaint as a "registered voter." App. 9. Although Mr. Lyman has, at various times, held other titles in Utah politics as an elected official or candidate, he was not any of those things when he filed his complaint and sued only in his capacity as a private citizen. App. 90.

The Lieutenant Governor moved to dismiss Mr. Lyman's complaint under rule 12(b)(1) for lack of jurisdiction. App. 23. She argued that he lacked standing as his mere allegations that the NVRA had been violated, without some other downstream consequence, were insufficient to show that Mr. Lyman had suffered a concrete and particularized injury. *Id.* at 27-36.

The district court granted the Lieutenant Governor's motion. It held that a statutory disclosure requirement does not automatically give the person who requests documents standing to challenge the denial of that request in federal court. App. 97. To the contrary, the court held the plaintiff must still show he has suffered an injury-in-fact

to invoke federal court jurisdiction. App. 96-102. The court held Mr.

Lyman had not done so because he alleged only an "informational

injury" with no adverse, downstream consequences as required by

*TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) and *Laufer v.

Looper*, 22 F.4th 871 (10th Cir. 2022). App. 111-12. It determined Mr.

Lyman's attempts to show such a downstream injury boiled down to the

allegation that he, as a voter, wanted to monitor the Lieutenant

Governor to ensure she was complying with the NVRA. App. at 101.

And that was not a concrete injury in fact. *Id.*

Because the district court dismissed the complaint for lack of

standing, it did not address Mr. Lyman's claim that the NVRA

preempts Utah's Election Code and therefore requires the Lieutenant

Governor to disclose the voter registration data.

Mr. Lyman appeals the district court's dismissal of the complaint.

9

*Amendments to Utah's Election Code*

Utah's legislature has since amended the Election Code.[3] Similar to before, it contemplates the release of public voter information. When the Lieutenant Governor receives a compliant request for voter registration information, including the payment of fees, she shall "disclose to the person the standard voter data from a public registered voter's voter registration record." Utah Code § 20A-2-603(2) (2026); Utah Code 63G-2-203(10).[4] Standard voter data includes the voter's full legal name, voter identification number, age range, residential and mailing addresses, county of residence, precinct, party affiliation or status as unaffiliated, status as active or inactive, the last date on which the voter updated their registration record, and the voter's voting history. Utah Code § 20A-2-601(14) (2026). It does not include years of birth, but it does include information about the voter's age range based on statutorily-defined increments. *Id.* § 20A-2-601(1) (2026).

---

[3] The amendments gave the Lieutenant Governor until May 24, 2026, to designate a current registered voter as "at-risk" if they meet the statutory criteria. Utah Code § 20A-2-602(1)-(4) (2026).

[4] Section § 20A-2-603(3) (2026) contains the requirements for a request for voter data.

10

The amendments remove the designations for private and withheld voters. Under the amendments, the Lieutenant Governor is only prohibited from sharing information that is not standard voter data from all voters and "any information" from an "at-risk" voter's registration record. Utah Code 20A-2-603(1) (2026). And voters may only apply for an "at-risk" designation if they are or reside with (1) a victim of, or threatened with, domestic or dating violence; (2) a law enforcement officer; (3) a public figure; (4) a member of the armed forces, or (5) a person protected by a protection order or protective order. Utah Code 20A-2-606(4) (2026). All voters who were classified as "withheld" before May 13, 2020, and all voters classified as "private" who qualified for an at-risk designation had to apply to their county clerk to be designated as at-risk. *Id.* This change to voter privacy by the Utah legislature renders moot Mr. Lyman's complaint that certain records designated as "private" are incorrectly classified as withheld. App. 17.

## Summary of Argument

The issue on appeal is whether Mr. Lyman's complaint alleged he suffered a concrete injury in fact when the Lieutenant Governor

11

declined to produce Utah's entire voter registration list in accordance with state law. The district court correctly held that Mr. Lyman's complaint failed to plead any such injury. He thus lacks standing to pursue his claims against the Lieutenant Governor in federal court.

**1.** Mr. Lyman has not alleged any injuries to him as a candidate. A plaintiff has the burden to plead facts alleging he satisfies all the requirements for standing, including an injury in fact. And standing is determined as of the time the complaint is filed; a plaintiff cannot use subsequent events to cure the complaint's standing defects. By his own allegations, Mr. Lyman was not a candidate when he filed his complaint. And while he now argues he had been a candidate in the past, he never pleaded that or alleged any injuries related to any such candidacy. Having failed to plead this theory below, Mr. Lyman cannot raise it now. His standing depends on whether he suffered an injury in fact as a voter.

**2.** Mr. Lyman has not alleged he suffered an injury in fact as a voter. He argues he suffered an "informational injury" when the Lieutenant Governor denied his request to inspect Utah's voter registration list—including the portions designated as private or

withheld under then existing state law—because "he does not have records and information to which he is entitled under federal law." But a plaintiff must do more than allege he was denied information in violation of a statute. Under *TransUnion* and *Looper*, a plaintiff must also allege that the denial of information caused him to suffer downstream consequences.

While this Court has not determined whether the downstream consequences requirement applies to informational injuries under the NVRA, several other circuits have held that it does based on adopted similar reasoning to this Court's *Looper* decision and held that it does. This Court should follow their lead and hold that Mr. Lyman does not have standing unless he pleads concrete and particular downstream consequences.

**3.** Mr. Lyman's complaint is facially deficient because he has not alleged any adverse downstream consequences that are both concrete and particular to him. His attempts to do so boil down to his desire to personally ensure the government is complying with state and federal voter registration eligibility and maintenance requirements. But those are not concrete or particular injuries but rather concerns shared

equally by the citizenry at large. Mr. Lyman's recent attempts to bolster those allegations—for example alleging he might identify a deceased relative who is still registered—are too speculative and hypothetical. And his arguments that he needs the information to protect his right to vote fare no better. Mr. Lyman has not alleged that he has been unable to register, vote, or otherwise participate in elections. Similarly, his argument that he needs the records to prevent voter dilution is not concrete and particular to him.

**4.** Finally, Mr. Lyman asks this Court to invalidate the privacy protections in Utah's Election Code. That argument goes to the merits of Mr. Lyman's complaint when the district court did not reach that issue below. Even if this Court determines Mr. Lyman has standing, this Court should not decide this issue in the first instance but should remand so the parties can make their arguments to the district court in the ordinary course of litigation.

## Argument

The district court properly dismissed Mr. Lyman's complaint for lack of standing. Standing is an "irreducible constitutional minimum" requirement for a justiciable case or controversy under Article III.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The party invoking federal jurisdiction has the burden to establish standing by alleging (1) he suffered an injury in fact that is both concrete and particularized (2) that is fairly traceable to the alleged conduct, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338-39 (2016); *Baker v. U.S.D. 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020). To survive the pleading stage, the complaint must "clearly . . . allege facts demonstrating each element." *Spokeo*, 587 U.S. at 338.

A complaint that does not sufficiently allege standing must be dismissed under rule 12(b)(1). A rule 12(b)(1) motion to dismiss for lack of standing may raise a facial or factual attack. A facial attack, like the one raised in the Lieutenant Governor's motion, assumes the allegations in the complaint are true but argues that they fail to plead jurisdiction. *Baker*, 979 F.3d at 872. An order granting a motion to dismiss raising a facial challenge is reviewed de novo, *Looper*, 22 F.4th at 875, applying the same standard used by the district court, *Petrella v. Brownback*, 697 F.3d 1285, 1292 (10th Cir. 2012).

Even when taken as true, Mr. Lyman's complaint fails to allege facts demonstrating standing. He filed his complaint as a private citizen and a voter. And he failed to allege that he had suffered an injury in that capacity because his allegations amount to no more than an informational injury without adverse downstream consequences. The district court followed both Supreme Court and Tenth Circuit precedent when it held that Mr. Lyman's allegations failed to confer standing to pursue his NVRA claims. This Court should affirm.

## I.    Mr. Lyman's unpled candidacy is irrelevant.

Mr. Lyman begins by arguing his standing is settled because "candidates have standing" under *Bost v. Ill. State of Elections*, 607 U.S. 71, 76 (2026). Aplt. Br. at 6. But that argument raises a new—and forfeited—theory of standing that Mr. Lyman did not plead. And in any case, *Bost* does not control Mr. Lyman's standing here.

### A.    Mr. Lyman failed to plead he was a candidate.

When Mr. Lyman filed his complaint, he alleged only that he was "a registered voter in the State of Utah." App. 9. The complaint does not allege that Mr. Lyman was a candidate or that he had suffered any injuries as a candidate. App. 8-16. Nor did Mr. Lyman argue in his

16

briefing to the district court that his standing was rooted in his candidacy for any office. App. 37-51. For that reason, the district court's decision specified that Mr. Lyman "brings this suit as a private citizen." App. 90. Mr. Lyman has not argued that finding was wrong.

To be sure, Mr. Lyman has held other positions in Utah politics. App. 90. And since the district court dismissed the complaint, he has declared his candidacy for the U.S. House of Representatives. Aplt. Br. at 8 n.2.

None of these other positions matter. Mr. Lyman's subsequently-declared candidacy is irrelevant because standing is determined "as of the time the action is brought," not by subsequent events. *Southern Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1152-53 (10th Cir. 2013). Even if a court revisits standing at later stages of the litigation, the "standing inquiry remains focused on whether the party invoking jurisdiction had a sufficient stake in the outcome when the suit was filed." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1162 (10th Cir. 2023). Mr. Lyman thus cannot use the candidacy he declared after the district court dismissed his complaint to repair that complaint's standing defects. *Id.* at 1162.

17

Mr. Lyman also cannot use his past candidacies to show he met his burden to plead standing. Mr. Lyman did not even mention such candidacies in his complaint, let alone allege that he had suffered any injuries related to them. App. 9-22. His arguments that he championed election transparency as a candidate and that not having the information "impairs his ability to be a candidate," Aplt. Br. at 8, are new on appeal, *see* App. 8-22, 37-51, 64-65, 83-85. Tellingly, Mr. Lyman's brief does not recite where he preserved any of these arguments. *See* 10th Cir. R. 28.1(A) (requiring parties to note where arguments were preserved).

The district court's observations that Mr. Lyman had been a candidate before, App. 90, 101, do not excuse Mr. Lyman's failure to plead any candidacy-related injuries. The court did not base its statements on anything alleged by Mr. Lyman, but rather on citations to state and federal litigation in which Mr. Lyman was involved. App. 90. But the court did not suggest Mr. Lyman suffered any injuries related to those candidacies or positions. On the contrary, the court followed its observations by declaring that Mr. Lyman brought his suit as a "private citizen." App. 90, 101. The district court's

acknowledgments that Mr. Lyman might have had access to additional information under Utah law if he had been a candidate, App. 101 (citing Utah Code 20A-2-104(4) (2025)),[5] only reinforces that Mr. Lyman did not bring his suit as a candidate.

Mr. Lyman's new candidacy theories of standing confirm the district court correctly found his complaint was facially deficient. Having failed to even allege a candidacy—let alone some injury related to it—Mr. Lyman failed to meet his pleading burden and forfeited that theory on appeal. *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019); *see also California v. Texas*, 593 U.S. 659, 674 (2021) (declining to consider "novel alternative theory of standing" that was not argued by plaintiffs in the courts below).

What's more, Mr. Lyman cannot rely on his candidacy theory on appeal because he has not even attempted to argue he satisfies this Court's demanding test to establish plain error when an issue is not

---

[5] The district court suggested Mr. Lyman would have been entitled to the information he sought under Utah law if he had been a candidate or office-holder. That statement is not quite correct. As Mr. Lyman notes, Utah law did not give candidates access to the information designated as withheld. *See supra* at 5.

raised below. *Leffler*, 942 F.3d at 1196 ("When an appellant fails to preserve an issue and also fails to make a plain-error argument on appeal, we ordinarily deem the issue waived . . . ."). Under that test, the appellant must show the district court committed a "clear or obvious" error that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010).

Citing *Bost*, which issued the day before the district court's opinion, does not satisfy Mr. Lyman's burden to establish plain error. Even before *Bost*, Mr. Lyman would have been aware of any potential injuries or harms he believed suffered as a candidate because he did not get the records he requested. Yet Mr. Lyman failed to plead any of those facts. Even if *Bost* addressed a candidate's standing to bring claims like Mr. Lyman's, he has not shown how the district court committed a plain error by not considering those injuries when Mr. Lyman never pled he was a candidate in the first place.

### B.    Mr. Lyman does not have standing under *Bost.*

In any case, *Bost* does not control the standing analysis here. For one, the *Bost* plaintiff's complaint alleged not only that he was a candidate but also that he was injured in that capacity. 607 U.S. at 75. He complained that the late counting of ballots harmed him because he organized and allocated resources for his campaign around federal election day statutes. *Id.* He also complained that the late-counted votes would reduce his margin of victory and, in turn, negatively impact public perception of his performance. *Id.* Mr. Lyman's complaint contains no such allegations. App. 8-22. *Bost* thus does not resolve whether Mr. Lyman's complaint was facially sufficient to satisfy his burden to plead he suffered a concrete and particular injury in fact as a candidate. *See Spokeo,* 587 U.S. at 338.

Beyond that, *Bost* does not govern the issue here. *Bost* determined that a candidate had standing to challenge how votes were counted "in their own elections" because even a winning candidate suffers a reputational injury if voters believe the process was unfair. 607 U.S. at 78, 82. *Bost* did not hold that past candidates have standing to challenge election laws generally, disconnected from any specific

election. Nor did *Bost* hold that past candidates have an interest in overseeing a state's ongoing voter-registration practices, as Mr. Lyman seeks to do here.

*Bost* also does not control the analysis of Mr. Lyman's standing as a voter. *Bost* did not hold voters have standing to raise election challenges. To the contrary, it noted a candidate's interest "differ[ed] in kind" to a voter's "general interest" in an accurate vote tally. *Id.* at 78. And *Bost* does not address what a voter would have to allege to have standing to raise such a challenge. *Id.*

Mr. Lyman is the master of his complaint. Yet he chose to only allege injuries he had suffered as a private citizen and a voter. Those allegations—not his past or future candidacies—frame the standing analysis here. As the district court found, Mr. Lyman does not have standing.

## II.    Mr. Lyman must plead more than a statutory violation or "informational injury" to have standing assert an NVRA claim.

Mr. Lyman alleges the Lieutenant Governor violated the NVRA when she refused to produce Utah's "full and complete" statewide voter registration list, including year of birth information and registrations

22

that were designated as private or that were "improperly classified as 'withheld.'" App. 18, 20-21. But Mr. Lyman must do more than allege a statutory violation or informational injury. He must also allege that he suffered an injury in fact. Like the district court, this Court should hold that Mr. Lyman must also show he suffered some personally relevant, downstream consequence because he did not receive the information. He has not done so.

## A.  Statutory violations do not automatically confer standing.

The NVRA requires states to maintain for at least 2 years" and to "make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters. . . ." 52 U.S.C. § 20507(i)(1). A "person who is aggrieved by a violation" of the NVRA may "bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation." 52 U.S.C. § 20510(b)(1), (2).

This Court has recognized that this language creates a private right of action. *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1078 (10th Cir. 2025). But the existence of such a right of action does

23

not automatically confer standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021).

Article III "grants federal courts the power to redress harms that defendants cause plaintiffs;" it is not a "freewheeling power to hold defendants accountable for legal infractions." *Looper*, 22 F.4th at 877 (internal quotation marks omitted). A plaintiff relying on a statutory violation thus must still demonstrate he has standing by alleging an injury, *TransUnion*, 594 U.S. at 426-27, 429, that is both concrete and particularized, *Spokeo,* 578 U.S. at 339.

Congress cannot simply "enact an injury into existence." *TransUnion*, 594 U.S. at 426. While it may "enact legal prohibitions and obligations," and even "create causes of action," the violation of those statutory provisions constitutes an "injury in law" and not an "injury in fact." *Id.* at 427. The congressional "creation of a statutory prohibition or obligation and cause of action" thus "does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III." *Id.* at 426.

*TransUnion* illustrates the distinction. There, purported class members alleged they were entitled to damages because their credit

files contained inaccurate information in violation of the Fair Credit

Reporting Act (FCRA). *Id.* at 430. But the court dismissed most of the

class members because their inaccurate information had never been

disseminated to third parties. *Id.* at 433. So while the inaccurate

information was potentially a statutory violation, the only plaintiffs

who had experienced a concrete injury for standing purposes were those

whose information had been disclosed. *Id.* at 442.

So too here. Mr. Lyman cannot acquire standing merely by

alleging a violation of the NVRA. He must also allege an injury in fact.

### B. An alleged informational injury, on its own, is not an injury in fact.

Even assuming Mr. Lyman's complaint pleads a statutory

violation of the NVRA, he lacks standing because he does not allege an

injury in fact. He alleges he has "suffer[ed] a concrete informational

injury because he does not have the records and information" he is

allegedly entitled to inspect under the NVRA. App. 18. But such an

informational injury, on its own, is insufficient to confer federal

standing under *TransUnion* and this Court's own precedent. A plaintiff

must also allege he has suffered personally adverse, downstream

consequences.

### 1.    An alleged informational injury must be accompanied by downstream consequences.

To satisfy the first element of federal standing requirements, a plaintiff must allege that he has suffered an injury in fact. *Spokeo*, 578 U.S. at 38-39. An injury in fact is "an invasion of a legally protected interest" that is both "concrete and particularized" to the plaintiff. *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560). Together with the other standing requirements, the injury in fact requirement "ensure[s] 'the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction.'" *Looper*, 22 F.4th at 876 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

Mr. Lyman's asserted informational injury, standing alone, does not satisfy these requirements. An "asserted informational injury that causes no adverse effects cannot satisfy Article III." *TransUnion*, 594 U.S. at 442 (internal quotation marks omitted); *Looper*, 22 F.4th at 880-81. Such an injury amounts to no more than an allegation that a statute or other legal entitlement has been violated. *See Looper*, 22 F.4th at 878. That's not enough. *Supra* at Part II.A. To have standing to file a suit over the denial of information, a plaintiff must also allege that he

26

has been concretely harmed by that denial. *Id.* at 877. Stated differently, the plaintiff must allege the denial of information caused him to suffer an adverse "downstream consequence[]" that has "some relevance" to him. *TransUnion*, 594 U.S. at 442 (internal quotation marks omitted); *Looper*, 22 F.4th at 881 (internal quotation marks omitted).

*TransUnion* and *Looper* illustrate this rule. In *TransUnion*, the plaintiffs claimed that the defendant credit reporting agency violated their rights by failing to provide their complete credit files in the format required by statute. 594 U.S. at 339-40. Specifically, the plaintiffs alleged that the defendant had sent them credit files that omitted alerts labeling them as potential terrorists. *Id.* at 440. Those alerts were only sent separately and, when they were sent, the defendant failed to resend a required summary of rights. *Id.* at 420-21.

The DOJ, as amicus curiae, argued these failures amounted to a "concrete informational injury," thus giving plaintiffs' standing to pursue their claims under the FCRA. *Id.* at 441 (internal quotation marks omitted). The DOJ argued, like Mr. Lyman does here, Aplt. Br. at 20-26, that an informational injury alone was sufficient to confer

standing. The Court disagreed, noting that the putative class of plaintiffs had not alleged any downstream consequences. *TransUnion*, 594 U.S. at 442. The sole exception was the named plaintiff who had alleged that he cancelled an international trip because he was confused by the way he received the information. *Id.*

Following *TransUnion*, this Court also held that a plaintiff must allege more than an informational injury. In *Looper*, a disabled plaintiff tried to sue the owners of hotel whose online reservation system allegedly failed to disclose legally required information about accessibility under the Americans with Disabilities Act (ADA). 22 F.4th at 874. The plaintiff alleged no intention of visiting the hotel, arguing instead that she was a "tester" who wanted to enforce compliance with the ADA. *Id.*

This Court rejected her argument. *Id.* at 877, 881. Relying on *TransUnion*, the Court held her alleged informational injury was insufficient to confer federal standing because she did not allege any downstream consequences that were personally relevant to her. *Id.* at 880-81. Her interest in using that information in litigation to enforce the hotel's compliance did not qualify as such an interest. *See id.* at 881.

28

These cases control the result here. Like the *Looper* plaintiff, Mr. Lyman alleges he was legally entitled to information that he did not receive. App. 18. But his allegation of a statutory violation does not, in and of itself, amount to an injury in fact under Article III. As in *TransUnion* and *Looper*, he must allege personally relevant and concrete downstream harms.

### 2. *TransUnion* and *Looper* extend to informational injuries under the NVRA.

To be sure, neither *TransUnion* nor *Looper* involved claims under the NVRA. Nor has this Court addressed informational injury claims under that law.[6] But three other circuits have extended *TransUnion* to hold that plaintiffs alleging they were harmed by the denial of information requested under the NVRA must also plead they suffered concrete and particular downstream consequences from the denial.

---

[6] In *Torrez*, this Court addressed standing under the NVRA, but it determined the claim in that case "[did] not rest on an informational injury." 160 F.4th at 1078. It rested on the chilling effect of a state penalty provision and possible state prosecution for recipients of voter information who use or disclose it in an unauthorized manner. *Id.* The district court correctly noted that *Torrez* does not resolve the standing question here. App. 104.

For example, in *Campaign Legal Center v. Scott*, plaintiffs were "civic engagement organizations" who requested a list of all registrants "identified as potential non-U.S. citizens." 49 F.4th 931, 934, 936 (5th Cir. 2022). The Fifth Circuit held that even if the plaintiffs had alleged a violation of the NVRA, that alleged violation alone did not give them standing. *Id.* at 936-37. Applying *TransUnion*, the court held the plaintiffs had to allege some downstream consequence to proceed. *Id.* at 939. But it ultimately determined they had not done so. *Id.* at 939. The organizations' allegations that they needed the requested information to cast "visibility" on how Texas was keeping its voter lists alleged an injury to the public "writ large" and was not concrete and particularized to them. *Id.* at 936-37. And their concerns that, without the information, they lacked the opportunity to identify incorrectly described voters were too speculative. *Id.* at 936-37.

The Third and Sixth Circuits have reached similar conclusions. Like *Scott*, the Third Circuit held that plaintiffs who allege an informational injury under the NVRA must identify some adverse consequence related to the NVRA's purposes. *Public Interest Legal Foundation v. Secretary Commonwealth of Pennsylvania*, 136 F.4th 456,

30

465 (3d Cir. 2025). And the Sixth Circuit held that a plaintiff who alleges an informational injury under the NVRA must "identify concrete downstream consequences." *Public Interest Legal Foundation v. Benson*, 136 F.4th 613, 629-30 & n.11 (6th Cir. 2025). It then held that held the Public Interest Legal Foundation (PILF)—the same organization that represents Mr. Lyman—did not have standing. *Id.* at 631. Its alleged downstream injuries—that the denial of records impaired the accumulation of information needed to perform its core function of monitoring NVRA compliance—were too vague and speculative. *Id.* at 631.

This Court should reach the same result here. The above cases are all consistent with *Looper's* holding that, following *TransUnion*, alleged informational injuries cannot convey standing without downstream consequences. *Looper*, 22 F.4th at 881. This Court should also extend *Looper*'s and *TransUnion's* holdings to claims filed under the NVRA.

### 3. Pre-*TransUnion* cases do not dictate a different result.

Despite that precedent, Mr. Lyman argues that he need not allege downstream injuries under three cases that were decided decades before *TransUnion*: *Public Citizen v. Department of Justice,* 491 U.S.

31

440 (1989); *FEC v. Akins*, 524 U.S. 11 (1998) and *Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982). Aplt. Br. at 21-23. But "much has happened in standing jurisprudence" since those cases were decided. *Commonwealth*, 136 F.4th at 463. Indeed, *Looper* explains that Mr. Lyman's argument fails under *TransUnion* because the plaintiffs in those prior cases did, in fact, plead downstream consequences. 22 F.4th at 881. That reasoning requires affirming the dismissal of this case, too.

> **a.** **_Looper_ rejected Mr. Lyman's argument that the pre-_TransUnion_ cases excuse him from pleading downstream consequences.**

This Court has already rejected Mr. Lyman's argument that he only needs to plead a violation of statutory disclosure provisions under *Public Citizen*, *Akins, and Havens Realty*. The *Looper* plaintiff also relied on those cases to argue she only had to show she did not receive legally-required information. *Looper*, 22 F.4th at 878-81. This Court disagreed, explaining that the plaintiffs in each of those cases had, in fact, alleged concrete, adverse consequences stemming from the non-disclosure. *Id.* Mr. Lyman's arguments fall under that reasoning.

**1.** *Public Citizen* and *Akins* do not support Mr. Lyman's argument that he only needs to plead the Lieutenant Governor denied his requests for information to allege an injury in fact. Aplt. Br. at 20-22.

In *Public Citizen,* a legal foundation sued the Department of Justice to compel it to designate the ABA's committee that advised the DOJ on judicial appointments as an advisory committee under the Federal Advisory Committee Act (FACA). 491 U.S. at 447. Public Citizen intervened as a plaintiff. *Id.* The plaintiffs alleged such a designation would subject the ABA Committee to the FACA's disclosure requirements, which would enable them to "participate more effectively in the judicial selection process." *Id.* at 449. The Supreme Court held that the legal organizations had standing, noting prior Freedom of Information Act (FOIA) decisions had "never suggested" those requesting records need show more than that those records were denied. *Id.*

Along those same lines, *Akins* held a group of voters had standing to sue the Federal Election Commission (FEC) to compel it to designate the American Israel Public Affairs Committee (AIPAC) as a political committee and to hold it liable for refusing to disclose certain financial

33

information under the Federal Election Campaign Act (FECA). *FEC v. Akins*, 524 U.S. at 16. The voters argued that their inability to obtain that information—including information about AIPAC's donors and campaign-related donations and expenditures—meant they could not effectively evaluate candidates who received financial assistance from AIPAC or "evaluate the role that AIPAC's financial assistance might play in a specific election." *Id.* at 21. The Court held they had standing to sue the FEC to impose the designation because their alleged informational injury, which was "directly related to voting," was "sufficiently concrete and specific . . . to authorize its vindication in the federal courts." *Id.* at 24-25.

The *Looper* plaintiff argued that she had suffered an informational injury like that recognized by *Public Citizen* and *Akins*. *Looper*, 22 F.4th at 880. But this Court held her argument failed under *TransUnion's* holding that "an asserted informational injury that causes no adverse effects cannot satisfy Article III." *Id.* at 881.[7] This

---

[7] This Court has acknowledged that this language is "arguably dicta." *Looper*, 22 F.4th at 881 n.5. But it determined it is bound by that Supreme Court dicta "almost as firmly as the Court's outright holdings,

34

Court reasoned that *TransUnion* had rejected the DOJ's informational injury argument—which also relied on *Akins* and *Public Citizen*—in part because "the [*TransUnion*] plaintiffs have identified no 'downstream consequences from failing to receive the required information." *Id.* (quoting *TransUnion*, 594 U.S. at 442).

This Court then explained that the plaintiffs in *Public Citizen* and *Akins* had "identified such adverse effects." *Id.* The *Public Citizen* plaintiff legal organizations needed it to participate in the federal judicial selection process, while the *Akins* plaintiffs needed it to determine how to vote. *See id.*; *see also Public Citizen,* 491 U.S. at 449; *Akins*, 524 U.S. at 21. Those adverse effects "had 'some relevance' to the plaintiffs, thus giving them standing. *Id.* (quoting *Griffen v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 654 (4th Cir. 2019)). The *Looper* plaintiff, in contrast, had not alleged that she had any interest in using the information beyond filing a lawsuit to enforce compliance with the law. 22 F.4th at 881. So although the *Looper* plaintiff may "have had a

---

particularly" where, as here, the "dicta is recent and not enfeebled by later statements" from the Court. *Id.*

regulatory right to the information," she had not demonstrated that her failure to get it "caused her to suffer any injury in fact." *Id.* at 881.

Mr. Lyman's reliance on *Public Citizen* and *Akins* fails the same reasons. Those cases do not allow him to proceed in federal court merely because he alleges that he had a legal right to information he did not get. He must allege the denial of records caused him, personally, to suffer a concrete and particular downstream harm.

**2.** *Looper* also shows why *Havens Realty* does not support Mr. Lyman's informational injury argument. *Havens Realty* held a tester had standing to sue the owner of an apartment complex after she was allegedly given false information about housing availability because of her race, even though she had no intention of renting from the defendant. *Havens Realty*, 455 U.S. at 372.

The *Looper* plaintiff argued she had suffered the same informational harm addressed in *Havens Realty*. *Looper*, 22 F.4th at 879. This Court disagreed. *Looper*, 22 F.4th at 879. The injury in *Havens Realty* was not the failure to get information. *Id.* at 879-80. It was instead being at the receiving end of a lie motivated by racial discrimination, which discrimination is itself an injury in fact to those

36

who personally experience it. *Id.* at 879-80. So contrary to Mr. Lyman's argument, Aplt. Br. at 22-23, *Havens Realty* does not hold a plaintiff has standing to sue over an informational injury without alleging some concrete injury in addition to the mere denial of information. *See Looper*, 22 F.4th at 879-80 (discussing discriminatory misrepresentation claims).

**3.** The upshot of *Looper* is this: a plaintiff claiming an informational injury in the Tenth Circuit following *TransUnion* must plead that he has personally suffered some adverse, downstream consequence. *Id.* at 880-81. *Akins, Public Citizen*, and *Havens Realty*— all of which predate *TransUnion*—do not allow plaintiffs to proceed in federal court merely by alleging that they were harmed by not receiving information because the plaintiffs in those cases did, in fact, plead downstream consequences. *Id.* at 879-81. The district court correctly followed *Looper* and *TransUnion* when it held that Lyman's complaint asserting NVRA claims must also allege downstream consequences that personally affect him, App. 100-01, and dismissing it because he failed to do so, *infra* Part III.

### b.    Downstream consequences are required even in public disclosure cases.

Still, Mr. Lyman argues that this Court should disregard

*TransUnion* and *Looper* because *TransUnion* involved the Fair Credit

Reporting Act, not a "public-disclosure law" or right. Aplt. Br. at 25-26

(quoting *TransUnion*, 594 U.S. at 441). And he argues this Court should

be "wary" of importing its prior *TransUnion* interpretation because it is

not "in harmony" with all the circuits. *Id.* at 14. This Court should

reject his arguments. Although not all courts have agreed on how to

interpret *TransUnion*, *Looper* is no outlier. The Third, Fifth, and Sixth

Circuits have adopted consistent interpretations of *TransUnion*. And

they have held that *TransUnion*'s requirements apply to the NVRA.

**1.** The root of the disagreement between the circuits is

*TransUnion's* explanation for why *Akins* and *Public Citizen* did not

support the DOJ's informational injury argument. *TransUnion*

determined that *Akins* and *Public Citizen* did "not control" because the

*TransUnion* plaintiffs had argued they received information in the

wrong format. 594 U.S. at 441. "In addition," the Court noted that *Akins*

and *Public Citizen* "involved [the] denial of information subject to

public-disclosure or sunshine laws." *Id.* The Court then continued, in

the same paragraph, to distinguish the *TransUnion* plaintiffs' claims

from the plaintiffs' claims in *Akins* and *Public Citizen*, stating,

"'[m]oreover, the [*TransUnion*] plaintiffs have identified no

"downstream consequences" from failing to receive the required

information." *Id.* at 441-42 (quoting *Trichell v. Midland Credit

Management., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020)). So, the Court

concluded: "An 'asserted informational injury that causes no adverse

effects cannot satisfy Article III.'" *Id.* at 442 (quoting *Trichell*, 964 F.3d

at 1004).

Mr. Lyman focuses on *TransUnion's* first reason—that *Akins* and

*Public Citizen* did not involve public disclosure laws. Aplt. Br. at 25. But

he does not grapple with *TransUnion's* third reason for distinguishing

*Akins* and *Public Citizen*—that "the plaintiffs' have identified no

downstream consequences.'" *TransUnion*, 594 U.S. at 441. And that

reason shows why a plaintiff must allege downstream consequences

even in the context of the NVRA. *See Scott*, 49 F.4th at 938.

**2.** The Third, Fifth and Sixth Circuits have addressed the same

argument Mr. Lyman raises and rejected it. In *Scott*, the Fifth Circuit

acknowledged there is some ambiguity in *TransUnion's* statement that

the plaintiffs had identified no "downstream consequences." *Id.* That statement could be read "to reference only a defect in the *TransUnion* plaintiffs' claims of injury but not to include the 'sunshine laws' covered by *Akins* and *Public Citizen*." *Id.* Or it could be read as a "defect" in the DOJ's informational injury theory even if *Akins* and *Public Citizen* applied. *Id.*

The Fifth Circuit determined that the latter reading is the better one: "even in public disclosure-based cases, plaintiffs must" assert "downstream consequences." *Id.* It reasoned the Supreme Court's inclusion of the downstream consequences requirement in the same paragraph where it rejected the DOJ's informational injury theory— which was based on *Akins* and *Public Citizen*—suggested downstream consequences were required even in cases like *Akins* and *Public Citizen*. *Id.*

That conclusion was "fortifie[d]" because the *TransUnion* Court quoted *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990 (11th Cir. 2020), when it explained the *TransUnion* plaintiffs failed to allege any "downstream consequences." *Scott*, 49 F.4th at 938. *Trichell* also rejected a claimed informational injury argument, albeit one based on

40

receiving false information. 964 F.3d at 1004. In rejecting their argument, the *Trichell* court explained that unlike its plaintiffs, "the plaintiffs in *Public Citizen* and *Akins* identified consequential harms from the failure to disclose the contested information." *Id*. *TransUnion's* determination that its plaintiffs had not pled "downstream consequences" implicitly adopted *Trichell's* interpretation of *Public Citizen* and *Akins*. *See Scott*, 49 F.4th at 938. So regardless of whether a law is a public disclosure law, plaintiffs "must and can assert "downstream consequences," i.e. they must identify "concrete harm from governmental failures to disclose." *Id*. The Sixth Circuit adopted *Scott's* interpretation, agreeing that plaintiffs must assert downstream consequences even in cases based on public disclosure laws. *Benson*, 136 F.4th at 630 & n.11.

The Third Circuit reached a similar conclusion. It observed that *TransUnion's* informational injury discussion had reiterated "the lessons of its prior cases: namely, to state a cognizable informational injury" a plaintiff must allege they failed to receive legally required information and that the omission "led to adverse effects or other downstream consequences" that have a nexus to the interest protected

41

by the statute. *Commonwealth*, 136 F.4th at 464. The *Akins* and *Public Citizen* plaintiffs, it said, had satisfied this test by alleging they had suffered harms—inability to make their own voting decisions or participate directly and effectively in performing their recognized role in the judicial selection process—that bore a "nexus to the harms that the statutes at issue [the FEC or FACA] were designed to prevent." *Id.* at 466.

While *Scott* and *Benson*, and *Commonwealth* may have articulated their tests in slightly different ways, the basic holding of all three is the same: an asserted informational injury under the NVRA without concrete and particular downstream effects cannot satisfy Article III. Still more, the reasoning of the Fifth and Sixth Circuit relied on to reach is in harmony with this Court's own interpretation of *TransUnion, Akins,* and *Public Citizen. See Looper*, 22 F.4th at 880-81; *see also supra* at Part II.B.3.a.

**3.** To be sure, not all circuits agree about whether a plaintiff must allege downstream consequences to bring a lawsuit challenging the

42

government's denial of an information request under the NVRA.[8] After

Mr. Lyman filed his opening brief, the Ninth Circuit held that the

denial of a request for information under the NVRA is an injury in fact.

*Pub. Int. Legal Found. Inc. v. Nago*, 174 F.4th 664, 670 (9th Cir. 2026).[9]

The Ninth Circuit interpreted *TransUnion* differently than the Third,

Fifth, and Sixth Circuits. *Id.* at 674. It held that *TransUnion* did not

suggest the plaintiffs in *Akins* and *Public Citizen* only had standing

because they alleged downstream harms. *Id.* The Ninth Circuit instead

interpreted *TransUnion* as concluding that *Akins* and *Public Citizen* did

not apply because the *TransUnion* plaintiffs' claims did not involve a

sunshine law and those plaintiffs had only alleged they received

---

[8] The district court also noted that parties below appeared to be on opposing sides of a developing circuit split based on Mr. Lyman's citation to *Pub. Int. Legal Found v. Bellows*, 92 F.4th 36, 48 (1st Cir. 2024). App. 106. The court correctly recognized that *Bellows* did not create a circuit split because the standing analysis in that case was based on the plaintiff's potential liability for civil monetary penalties for disclosing information, and not on the type of informational injury alleged here. App. at 110; *Bellows*, 92 F.4th at 50-51.

[9] Although *Nago* held that PILF had standing, it ultimately determined that the "statewide list of registered voters" that PILF had requested was not a record subject to disclosure under the NVRA. 174 F.4th at 667, 682-83.

information in the wrong format. 174 F.4th at 673-74. *Nago* also held that a plaintiff asserting an injury under a public disclosure provision like the one in the NVRA need only show it was denied information "regardless of whether" that provision is part of a larger statutory framework, rejecting the Third Circuit's nexus requirement in *Commonwealth*.174 F.4th at 675.

This Court should reject the Ninth Circuit's broad holding that plaintiffs claiming injuries under the NVRA need not plead any adverse consequences. It reflects the minority approach among circuits that have addressed whether a plaintiff bringing an NVRA claim must allege downstream injuries. More to the point, the Ninth Circuit's decision departs from this Court's own precedent explaining that *TransUnion* requires plaintiffs to allege the denial of information causes adverse effects. *Looper*, 22 F.4th at 880-81.

**4.** Despite *Looper*, Mr. Lyman suggests the balance tips in favor of the approach now adopted by the Ninth Circuit, Aplt. Br. at 23-25, because "Congress has spoken" and "decided that 'all' covered records are available to him. Aplt. Br. at 25-26. But when Congress spoke through the NVRA, it also determined that only a "person who is

44

aggrieved" by the violation of the NVRA may bring an action for declaratory and injunctive relief. 52 U.S.C. § 20510(b). In other words, the person must have suffered an injury in fact.

The NVRA's language stands in notable contrast to the language of the Freedom of Information Act (FOIA), a law whose "standing framework" Mr. Lyman also invokes albeit without engaging with its actual text. Aplt. Br. at 20-21. FOIA simply provides that, "on complaint," a federal district court "has jurisdiction" to "enjoin" a federal agency from withholding documents or "order the production of documents" as part of its review of the federal agency's action under the Administrative Procedures Act. 52 U.S.C. § 552(a)(4)(B). So even assuming Mr. Lyman correctly asserts that, even after *TransUnion*, FOIA's "standing framework" does not require any downstream injuries, Aplt. Br. at 20-21, that lower threshold was arguably contemplated by Congress. But Congress raised the bar in the NVRA by limiting its cause of action to "aggrieved person[s]."

In any case, Mr. Lyman's argument that he has standing because the NVRA contains a disclosure provision conflates the merits of his claims with the standing analysis. Indeed, Congress had spoken in

45

*TransUnion*, too, by prohibiting credit reporting companies from including false information in credit files and requiring the defendant to make certain information available to the public in a particular way. *TransUnion*, 594 U.S. at 418-19. Yet the plaintiff still had to allege downstream consequences when the defendant violated those statutory requirements. *Id.* at 439, 441-42; *cf. Looper*, 22 F.4th at 880-81 (holding plaintiff must show downstream consequence despite DOJ regulation requiring public disclosure of certain information). So too here.

**5.** The various other cases Mr. Lyman cites from outside of this Circuit are not persuasive for similar reasons. Aplt. Br. at 23-25. Several of them pre-date *TransUnion*. *See* Aplt. Br. at 21, 24-15 (citing *Zivotofsky v. Sec'y of State,* 444 F.3d 614, 617 (D.C. Cir. 2006); *Project Vote/Voting for Am., Inc. v. Long*, 752 F. Supp. 2d 697, 702 (E.D. Va. 2010); and *Jud. Watch, Inc. v. King*, 993 F. Supp. 2d 919, 923 (S.D. Ind. 2012)). Indeed, one of the district court cases Mr. Lyman cites is from the Fifth Circuit and would, presumably, be decided differently following *Scott*. Aplt. Br. at 24 (citing *Pub. Int. Legal Found. v. Bennett,* Civ. Action No. H-18-0981, 2019 WL 1116193, at *3-4 (S.D. Tex., Feb. 6, 2019)).

46

What's more, only one of the district court cases Mr. Lyman cites on this issue comes from within the Tenth Circuit. Aplt. Br. at 25 (citing *Jud. Watch, Inc. v. Griswold*, No. 20-cv-02992, 2022 WL 3681986 (D. Colo. Aug. 25, 2022) (*Griswold II*). But *Griswold II* adds little here. It denied a state's motion asking the court to reconsider its partial denial of the state's motion to dismiss in light of *TransUnion*. *Id.* at *2. The court declined to reconsider its ruling because the state's argument— which was different from the arguments here—could have been raised under previously-existing case law. *Id.* at *3. But in denying the motion to reconsider, the Court did not discuss whether a plaintiff asserting an informational injury must plead downstream consequences. Nor did it discuss, or even cite, *Looper*.

**6.** At bottom, this Court should follow its own precedent in this case. And that precedent points in the same direction as the Third, Fifth and Sixth Circuits' holdings that a plaintiff challenging the denial of records under the NVRA must plead some downstream consequences that are particular to the plaintiff. As discussed next, the district court correctly held that Mr. Lyman's complaint fails to allege such downstream harm.

47

### III.  Mr. Lyman has not alleged downstream consequences.

Mr. Lyman failed to plead any particular and concrete downstream consequences from not receiving Utah's statewide voter registration list. Recall that to plead an injury-in-fact, a plaintiff must allege he suffered "an invasion of a legally protected interest which is . . . concrete and particularized." *Looper*, 22 F.4th at 876. An injury is particularized if it "affect[s] the plaintiff in a personal and individual way." *Id.* To be concrete, it must be "'real' rather than 'abstract.'" *Id.* Additionally, the plaintiff's alleged injuries must be "actual or imminent, not conjectural or hypothetical." *Id.* If the threatened injury is not "certainly impending, there must at least be a "substantial risk that the harm will occur." *Id.* Speculation about harms that might someday occur is not enough. *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016).

Mr. Lyman argues that he has alleged such particular and concrete downstream consequences. Aplt. Br. at 10-16. He points to five allegations in his complaint to support his assertion: (1) he cannot "study and analyze Utah's voter list maintenance programs and activities"; (2) he cannot "assess Utah's enforcement of state and federal

voter eligibility requirements"; (3) he cannot "assess Utah's compliance with voter list maintenance obligations"; (4) he cannot "assess whether Utah is employing voter list maintenance best practices"; and (5) he cannot "promote compliance with current obligations and best practices." Aplt. Br. at 10-12; App. 18, 20.

None of these is a concrete and particularized injury. Even accepting them as true, the district court correctly found that they do not amount to downstream adverse consequences because, at bottom, they only state his "desire to monitor and sue the Lieutenant Governor for alleged NVRA violations." App. 101. Such vague and general interests in ensuring the government follows the law—which are shared across the electorate—are not sufficiently concrete or particular to satisfy the injury in fact requirements.

**1.** Mr. Lyman first asserts he has a downstream injury because he wishes to study and analyze Utah's voter list maintenance programs and activities. Aplt. Br. at 10-11. This amounts to a downstream consequence, he says, because "candidates" have a personal stake in how election results are determined and regarded. Aplt. Br. at 10-11. But, as discussed, Mr. Lyman did not plead he was a candidate nor

allege any election in which he had such a personal interest. *Supra* at Part I.

Mr. Lyman's brief on this point does not even argue he had an interest in studying and analyzing Utah's voter list as a voter. Aplt. Br. at 10. He has not alleged, for instance, that his inability to study the protected parts of the voter list has impeded his ability to register to vote or cast a vote in elections. And his argument that he has been injured because he cannot review all the information he alleges is required by the NVRA, *id.* at 11, does no more than assert a mere statutory denial that cannot, on its own, support standing. *See supra* at Part II.A, B.

**2.** Second, Mr. Lyman alleges he cannot assess Utah's "enforcement of state and federal voter eligibility requirements." Aplt. Br. at 11; *see also id.* at 14. Citing *Bost*, he argues that he—as a candidate—has a particular interest in ensuring an election is not "unfair and inaccurate." Aplt. Br. at 11. This argument, again, relies on a candidacy that was not pled and did not exist when he filed his complaint. *Supra* at Part I. *See supra* at Part I; *Scott*, 49 F.4th at 936 n.6 (declining to address theory of standing not articulated in the

complaint and raised for the first time on appeal because theory was forfeited).

Bost also does not support Mr. Lyman's argument that he, as a voter, has a particularized interest in enforcing general election integrity or fairness in state elections. Quite the opposite. Bost distinguished a candidate's particularized interest in the election from a voter's generalized one. 607 U.S. at 78. Mr. Lyman cannot overcome that generalized interest by arguing "where necessary, [he] intends to use his findings to pursue legal action to enforce the NVRA" Aplt. Br. at 11. This argument is the same one made, and rejected, in Looper. The inability to use the requested information to bring a lawsuit to enforce legal compliance is not a concrete, downstream consequence. Looper, 22 F.4th at 881. Nor are private citizens "deputized as private attorneys general empowered to enforce any and all violations of a statute without regard to their personal stake in the matter." Commonwealth, 136 F.4th at 468.

Mr. Lyman tries to distinguish himself from the Looper plaintiff, arguing that, unlike her, he has "alleged a real and concrete adverse effect" because he intends to use that information in "his quest for

51

public office and as a Utah voter." Aplt. Br. at 15. His argument that he might someday use the data in his "quest for public office" fails for the same reasons as his candidacy arguments: it was not pled. In any case, his vague "'some day' intentions" to use information do not cross the the "actual or imminent injury" threshold imposed by Article III. *DeWilde v. Attorney General of United States*, No. 23-8054, 2024 WL 1550708, *3 (10th Cir. April 10, 2024) (unpublished) (quoting *Baker*, 979 F.3d at 875) (holding desire to own a gun was to abstract to support a credible threat of prosecution).

None of Mr. Lyman's potential uses for the voter information push his allegations over the standing threshold. For example, Mr. Lyman alleges that he could "plausibly discover someone on the active voter rolls that he knows to be deceased, such as a relative," Aplt. Br. at 11, or find a duplicative registration, *id.* at 13. Mr. Lyman does not explain how a mistaken registration amounts to a particular and concrete harm to him as a voter since it does not impair his ability to register, vote, or otherwise participate in elections. Nor does he explain how he would even have standing to pursue litigation against the government if he did find such a mistaken registration. He is thus not like the plaintiffs

52

in *Akins* that needed the information so they could evaluate which candidates deserved their votes and other support. *Looper*, 22 F.4th at 880.

Even so, the off-chance that Mr. Lyman might discover the registration of a dead relative is far too speculative to qualify as a concrete and particularized injury, much less a certainly impending one. *Scott*, 49 F.4th at 937. *Scott* rejected a similar argument, finding its plaintiffs' claims about lack of opportunity to identify "incorrectly described" voters was a "speculative rather than concrete grievance." *Id.* While Mr. Lyman is a voter and not an organization, Aplt. Br. at 19, his allegations that there are deceased voters, some of whom may be his relatives, on the non-public voter registration list is no less speculative than the allegations in *Scott*.

**3.** Third, Mr. Lyman alleges he has a concrete harm because he cannot assess Utah's compliance with "voter list maintenance obligations."[10] Aplt. Br. at 11; *see also* Aplt. Br. at 14 (arguing Mr.

---

[10] Mr. Lyman seemingly attempts to distinguish his second and third points by alleging one is about monitoring compliance with "voter eligibility requirements" and the other is about monitoring compliance with "voter list maintenance obligations." Aplt. Br. at 11-12. But he repeats both the eligibility and maintenance argument, albeit in reverse

Lyman cannot analyze compliance with federal requirements). As an example, he asserts he cannot determine if the state is missing date of birth information. Aplt. Br. at 12. Like his claim about finding a deceased family member, that is far too speculative an allegation to amount to an injury in fact. *Supra* at 52.

Aside from that flaw, Mr. Lyman's inability to act as a self-appointed legal compliance monitor is not an injury in fact. *Looper*, 22 F.4th at 881. That holds particularly true when a claim is asserted against the government. A plaintiff does not state an Article III case or controversy by alleging a "generally available grievance about government" that claims harm to plaintiffs'—and every other citizens'—"interest in proper application of the Constitution and laws" or by "seeking relief that no more directly and tangibly benefits him than it does the public at large." *Lujan*, 504 U.S. at 574. The general desire to assess the state's compliance with the law, even if it is based on "news accounts," Aplt. Br. at 12, is not particular or concrete to Mr. Lyman.

---

order, in both sections. There thus appears to be no substantive difference between the two theories.

For that reason, among others, his allegation does not establish a case and controversy under Article III. *Lujan*, 504 U.S. at 574; *see also Allen v. Wright*, 468 U.S. 737, 754 (1984). ("[A]n asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court.").

Mr. Lyman does not make this generalized interest in enforcing the government's legal compliance particular or concrete to him by alleging that he "cannot determine whether election officials are protecting his . . . right to vote." Aplt. Br. at 12.  Mr. Lyman has not alleged that he is concerned that the state has improperly removed him from the voter rolls or done anything to undermine his ability to vote.[11]

---

[11] Mr. Lyman's brief broadly asserts that he needs the records to "confirm that his *own right to vote* is being protected."  Aplt. Br. at 15. But Mr. Lyman does not allege he requested information about his own voter registration. App. 9-21, And if he had, the Lieutenant Governor does not dispute he would be entitled to receive it. *See* *https://vote.utah.gov/national-voter-registration-act-nvra-data/* ("All voters, including those with a private or withheld status, may view their own registration record to confirm their registration status on the voter registration lookup tool on www.vote.utah.gov."); *see also* Utah Code § 63G-2-202(1) requiring government agencies to disclose private records to the subject of those records upon request). The Lieutenant Governor understands Mr. Lyman's point to be an argument about election integrity or voter dilution, not an argument expressing concern about whether Mr. Lyman has been removed from the voter rolls.

His argument appears to be that his vote is threatened by the presence of voters who do not belong, such as registrants who are deceased or duplicative, among others. Aplt. Br. at 11-12. But "[f]ederal courts almost universally find that a plaintiff . . . who asserts abstract concerns and generalized grievances and fears about vote dilution and election integrity" lacks "standing to assert" such claims. *1789 Found., Inc. v. Schmidt,* 781 F. Supp.3d 282, 310-11 (M.D. Pa 2025) (citing cases); *see also Lance v. Coffman*, 549 U.S. 437, 441-42 (2007) (per curiam) (voters had no standing to challenge Colorado constitutional provision on grounds it violated U.S. Constitution's Election Clause because it was a generalized grievance about the conduct of government); *Marlyand Election Integrity, LLC v. Maryland State Bd. of Election*, 127 F.4th 534, 540 (4th Cir. 2025) (holding vote dilution caused by counting invalid votes "affects all voters in a State in the same way . . . [and] cannot support Article III standing").

Even *Judicial Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1091, 1103 (D. Colo. 2021) (*Griswold I*), cited by Mr. Lyman, found concerns about hypothetical vote dilution too generalized to support standing because the potential diminution in the value of each vote would be shared

56

equally by the electorate. *Id.* at 1102-03; *see also Bost*, 607 U.S. at 78

(characterizing voter's interest in an election as "general). And while

*Griswold I* did find that its plaintiff voters had alleged other injuries

that conferred standing (that they currently lacked confidence in the

electoral process and were discouraged from voting), Mr. Lyman has not

pled an equivalent injury. *Griswold I* does not show the district court

erred when it found Mr. Lyman had not pled any downstream

consequences.

Mr. Lyman attempts to distract from all these problems by

suggesting his desire to monitor compliance is an injury in fact because

this Court's *Torrez* opinion "held that 'critical scrutiny and public audits

of voter data were envisioned by Congress in passing the NVRA." Aplt.

Br. at 11-12 (quoting *Torrez*, 160 F.4th at 1082). That statement comes

from *Torrez's* preemption analysis, which addressed different claims

and, at any rate, *Torrez* also required its plaintiff to have standing

before it reached the merits of those claims. 160 F.4th at 1078-79, 1081-

82 (holding plaintiff had standing to raise claims the NVRA preempted

state's use restrictions and data sharing ban because it alleged those

provisions chilled its speech). Unlike the *Torrez* plaintiffs, Mr. Lyman has not alleged any injury that is concrete and particular to him.

**4.** Fourth, Mr. Lyman alleges he cannot determine whether Utah is employing voter list maintenance best practices. Aplt. Br. at 12; App. 18, 20. His attempt to make a concrete and particularized injury out of this allegation largely resembles his previous arguments. He again falls back on his unpled candidacy and relies on speculation about duplicate registrations. Aplt. Br. at 12-13. And his argument that he cannot recommend some unnamed best practices sounds in legal compliance and "someday" intentions. If he has no more interest than any other citizen in enforcing compliance with the law, he certainly doesn't have a concrete and particular interest in proposing vague "best practices," whatever he thinks those may be, at some unspecified future time.

Mr. Lyman argues that his desire to propose best practices is comparable to the plaintiff in *Public Interest Legal Foundation Inc. v. Fontes*, 816 F. Supp. 3d 984 (D. Az. 2026). Aplt. Br. at 17. That case is distinguishable. There, the plaintiff was an organization who alleged that the denial of information was impeding its "organizational mission." 816 F. Supp. at 990. And it pled the damages to that mission

58

with more particularity than Mr. Lyman's complaint. *Id.* at 991. For example, it identified "specific categories of reports" it prepares aimed at promoting best practices and that it could not prepare those reports without the information. *Id.* The court found the plaintiff had alleged downstream consequences because those allegations (1) were particularized to the Foundation because they affected its own activities, (2) concrete because the Foundation alleged they could not prepare specific work product, and (3) "actual and not hypothetical" because the Foundation alleged it could not "complete the work it intended to do" with the records. *Id.* at 991-92.

Mr. Lyman's allegations are not so specific. He has not identified any interest that is particular to him and that is not shared with the general electorate. And his allegations that he some day wants to recommend unidentified "best practices" are far too general and hypothetical. Unlike the plaintiffs in *Fontes* or even *Public Citizen*, he cannot allege an organizational mission to educate or engage in such advocacy. And even if that weren't required, Mr. Lyman does not allege what specifically he would do with that information that he cannot do now. He does not, for instance, allege he cannot prepare specific work

product, allege he has any expertise or authority to recognize what potential best practices might be, or allege how he might propose them or advocate for their adoption.

**5.** Mr. Lyman's final attempt to identify a downstream injury is his allegation that he cannot "promote compliance with current obligations and best practices." Aplt. Br. at 13. This fails for all the same reasons. Mr. Lyman has not alleged that he has been unable to exercise his right to vote or that the Lieutenant Governor has done something to burden that right. He cannot bring a lawsuit to monitor the government's legal compliance. *See* supra at 54-55. Nor has he identified any injury related to any "current obligations or practices" that is concrete and particular to him.

Because none of these allegations plead a concrete injury in fact that is particular to Mr. Lyman, he has failed to allege any downstream consequences. His injury is only informational, so the district court correctly determined he failed his burden to plead standing and dismissed the complaint. This Court should affirm that ruling.

## IV.   This Court should not address the merits of Mr. Lyman's NVRA challenges in the first instance.

Mr. Lyman spends just over a single page of his brief inviting this Court to "knock down" the Utah Election Code's restrictions on his ability to obtain information. Aplt. Br. at 8-10. His sole support is that *Torrez* recently held that a couple of New Mexico's restrictions were preempted by the NVRA. Aplt. Br. at 9.

This Court should decline his invitation. For one, it goes to the merits of the claims Mr. Lyman asserts in his complaint, not standing. Because the district court dismissed the complaint for lack of standing, it did not address those issues. Even if this Court finds Mr. Lyman has standing, it should limit its review to the grounds decided by the district court and not decide the merits issues in the first instance. *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1238 (10th Cir. 2005) (stating that "proper judicial administration generally favors remand for the district court to examine," for the first time, issues not ruled on below).

Additionally, *Torrez* involved challenges to New Mexico's use restrictions and data sharing ban. 160 F.4th at 1075, 1082-84. It did not address the specific claims Mr. Lyman makes here that he is entitled to

61

birth year data or information about voters designated as private or withheld (now called at-risk). Indeed, the Court noted that the parties in *Torrez* had focused their arguments on whether records include "dynamic, electronic documents" and not on "whether the requested voter data in fact concerns the implementation of relevant program and activities," or whether the requested information was "personal data . . . irrelevant to the respective programs and activities as defined in the NVRA." *Id.* at 1084 & n.17. Here, no party has had the opportunity to make any of those arguments below. If Mr. Lyman has standing, the Court should allow them the opportunity to address them in the ordinary course of the litigation on remand.

## Conclusion

For the reasons above, Mr. Lyman lacks standing. This Court should affirm the district court's order dismissing his complaint.

Respectfully Submitted,

Derek Brown
Utah Attorney General

*/s/ Erin T. Middleton*
Erin T. Middleton
Deputy Solicitor General
*Counsel for Appellee*

62

## Certificate of Compliance

I certify that:

1.    All required privacy redactions have been made.

2.    This brief complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2)(C) because it contains 12,104 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B).

3.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 10th Cir. R. 32(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

DATED this 22nd day of June 2026

/s/ Erin T. Middleton
Erin T. Middleton
Deputy Solicitor General
*Counsel for Appellee*

63

## ECF Certifications

Pursuant to Section II(J) of the Court's CM/ECF User's Manual, the undersigned certifies that:

1.  all required privacy redactions have been made;

2.  hard copies of the foregoing document required to be

submitted to the clerk's office are exact copies of the document as filed via ECF; and

3.  the document was scanned for viruses with the most recent

version of Microsoft Defender Antivirus, and according to the program is free of viruses.

June 22, 2026

/s/ Erin T. Middleton
Erin T. Middleton
Deputy Solicitor General
*Counsel for Appellee*

## Certificate of Service

I hereby certify that on this 22nd day of June 2026, I delivered the foregoing *Appellee's Principal Brief* by electronic filing, electronic mail, and/or by depositing a copy in the United States Mail, postage prepaid, addressed to the following:

Goud P. Maragani
goud.p.maragani@proton.me
Kaylan Phillips
kphillips@publicinterestlegal.org

*/s/ Erin T. Middleton*
Erin T. Middleton
Deputy Solicitor General
*Counsel for Appellee*

## Addendum

A. Memorandum Decision and Order Granting Defendant Lieutenant Governor Deidre Henderson's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(1)

B. Judgment, Case No. 4:25-cv-00069-DN-PK

# Addendum A

Memorandum Decision and Order Granting Defendant Lieutenant Governor Deidre Henderson's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(1) (01/15/2026)

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| PHIL LYMAN,<br><br>               Plaintiff,<br><br>v.<br><br>DEIDRE HENDERSON, in her official capacity as Lt. Governor of the State of Utah,<br><br>               Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT LIEUTENANT GOVERNOR DEIDRE HENDERSON'S [18] MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1)**<br><br>Case No. 4:25-cv-00069-DN-PK<br><br>District Judge David Nuffer |

Plaintiff Phil Lyman asserts that he has been denied the statutory right under the National Voting Rights Act of 1993 ("NVRA") to inspect the Statewide Voter Registration List of the State of Utah ("Utah voter rolls").[1] Mr. Lyman alleges that Defendant Lieutenant Governor ("Lt. Governor") Deidre M. Henderson violated his federal statutory right by relying on Utah law, which he argues the NVRA preempts, and by denying him access to Utah's voter rolls beyond what is already publicly available.[2] Mr. Lyman claims a continuing informational injury persists despite exhausting every administrative remedy to avoid litigation.[3]

Lt. Governor Henderson moves to dismiss Mr. Lyman's case for lack of standing.[4] The Lt. Governor contends that under *TransUnion v. Ramirez*,[5] Mr. Lyman has "failed to establish . . . concrete injury-in-fact based on generalized grievances from alleged violations of

---

[1] Complaint, docket no. 1, filed June 6, 2025.

[2] *Id*. ¶¶ 21-24.

[3] *Id*. ¶¶ 25, 48.

[4] Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) ("Motion"), docket no. 18, filed August 4, 2025.

[5] *Id*. at 8 (*citing TransUnion, LLC v. Ramirez,* 594 U.S. 413, 426-27 (2021)).

the NVRA."[6] The Lt. Governor argues that a statutory injury alone is insufficient. The Lt.

Governor argues that the facts alleged "underscores the lack of any real downstream

consequences by alleging nothing more than the 'informational injury' as [Mr. Lyman]

characterizes it."[7]

Mr. Lyman opposes the Motion asserting, "the Lt. Governor's factual focus in

*TransUnion* steers her legal analysis astray" and is "flat wrong."[8] Instead, Mr. Lyman states that

the holding in *TransUnion* is distinguishable, and that "the standing inquiry is controlled by

*Public Citizens* [*v. United States Dep't of Justice*] and [*FEC v.* ] *Akins*."[9] Mr. Lyman says public

disclosure obligations, like the NVRA, are less like the injuries articulated in *TransUnion*, and

more similar to federal Freedom of Information Act ("FOIA") injuries.[10] On this basis, Mr.

Lyman asks that the Motion be denied.

Lt. Governor Henderson replies stating Mr. Lyman is recycling arguments previously

rejected by the Third, Fifth, and Sixth Circuits.[11] According to Lt. Governor Henderson, each

circuit court "held that plaintiffs asserting mere 'informational injury' under the NVRA [do] not

satisfy Article III standing. And those courts properly applied the Supreme Court's analysis in

*TransUnion.*"[12] Accordingly, the Lt. Governor moves for an order that agrees with those circuits

holding that Mr. Lyman has failed to "identify downstream consequences that have a nexus to

---

[6] Motion at 14.

[7] *Id*. at 11.

[8] Lyman's Response to Motion to Dismiss ("Opposition") at 4, docket no. 27, filed August 29, 2025.

[9] *Id*. at 5 (cleaned up).

[10] *Id*. at 2-5.

[11] Lt. Governor's Reply in Support of Motion to Dismiss ("Reply") at 2, docket no. 28, filed September 12, 2025 (citing *Public Interest Legal Foundation v. Secretary Commonwealth of Pennsylvania*, 136 F.4th 456 (3rd Cir. 2025); *Campaign Legal Center v. Scott*, 49 F.4th 931 (5th Cir. 2022); *Public Interest Legal Foundation v. Benson*, 136 F.4th 613 (6th Cir. 2025)).

[12] Reply at 2.

the interest Congress sought to protect with the NVRA." Such a holding would require a dismissal of this case.[13]

After the parties submitted their briefs, but before this order was issued, the U.S. Court of Appeals for the Tenth Circuit released its opinion in *Voter Reference Found. v. Torrez*.[14] In *Torrez*, the Tenth Circuit addressed standing under the NVRA for the first time since the Supreme Court's decision in *TransUnion*.[15] The Tenth Circuit found standing in *Torrez* because the claim "does not rest on an informational injury; it rests on the statute's chilling effect" as a basis for a threat of criminal prosecution.[16] Because *Torrez* was published after the parties submitted their initial memoranda, supplemental briefing was ordered to address its potential impact on this case.[17] The Lt. Governor submitted her supplemental memorandum on December 19, 2025.[18] Mr. Lyman filed his supplemental brief regarding *Torrez* on January 2, 2026.[19] Mr. Lyman filed a subsequent supplemental notice of the District of Arizona's decision in *Public Interest Legal Foundation v. Fontes*.[20] All submissions have been fully considered in this order.

A thorough review of the memoranda, exhibits, supplemental briefs, and applicable law has been completed. For the reasons stated below, the Motion is GRANTED. Furthermore, Mr.

---

[13] Reply at 7.

[14] *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068 (10th Cir. 2025).

[15] *Id*. at 5.

[16] *Id*.

[17] Docket Text Order, docket no. 36, filed December 5, 2025.

[18] Defendant Lt. Governor Henderson's Memorandum Regarding Supplemental Authority in Support of Motion to Dismiss ("Lt. Governor's Supplement"), docket no. 37, filed December 19, 2025.

[19] Plaintiff's Supplemental Memorandum ("Lyman's Supplement"), docket no. 38, filed January 2, 2026.

[20] Lyman's Third Notice of Supplemental Authority ("Fontes Supplement"), docket no. 39, filed January 13, 2026 (*discussing Public Interest Legal Foundation v. Fontes*, No. CV-25-02722-PHX-MTL, 2026 WL 45037 (D. Ariz. Jan. 5, 2026).

3

Lyman's Motion for Summary Judgment[21] and the Lt. Governor's Motion for Relief under

Federal Rule of Civil Procedure 56(d)[22] are both FOUND MOOT.

1    BACKGROUND ................................................................................................ 4
2    STANDARD OF REVIEW ............................................................................... 7
3    DISCUSSION .................................................................................................... 9
     3.1    A Statutory Right Does Not Automatically Create an Injury In Fact.................... 9
            3.1.1    A Private Right of Action Exists Under the NVRA. ............................... 10
            3.1.2    An Asserted Informational Injury That Causes No Adverse Effects Cannot
                     Confer Article III Standing. .................................................................. 10
            3.1.3    The Supplemental Authority Informs Without Binding This Case. ......... 16
            3.1.4    Circuit Courts Agree That After *TransUnion* an Informational Injury
                     Without Downstream Consequences Does Not Establish Standing. ........ 21
4    CONCLUSION.................................................................................................. 25
5    ORDER ............................................................................................................. 26

## 1    BACKGROUND

Phil Lyman is a registered voter in the state of Utah.[23] Mr. Lyman has served as County

Commissioner for San Juan County[24] and as a Utah state representative.[25] Most recently, Mr.

Lyman ran for Governor of Utah.[26] Currently, Mr. Lyman does not hold political office in Utah

and is a private citizen. Mr. Lyman brings this suit as a private citizen, seeking voter list

maintenance documents to assess what Mr. Lyman calls the "Statewide Voter Registration List"

(hereinafter "Utah's voter roll").[27]

On September 22, 2024, Mr. Lyman sent a letter to Lt. Governor Henderson's office

requesting "voter list maintenance records," including: "a copy of the statewide voter registration

---

[21] Lyman's Motion for Summary Judgment, docket no. 17, filed July 29, 2025.

[22] Motion for Relief under Federal Rule of Civil Procedure 56(d), docket no. 33, filed November 24, 2025.

[23] Complaint ¶ 3.

[24] *Chilcoat v. San Juan County*, No. 4:19-CV-00027-DN, 2025 WL 3034914 (D. Utah Oct. 30, 2025).

[25] *United States v. Lyman*, No. 2:14-CR-00470 DN, 2019 WL 5310263, at *1 (D. Utah Oct. 21, 2019).

[26] *Lyman v. Cox*, 2024 UT 35, 556 P.3d 49, *cert. denied*, 145 S. Ct. 1057 (2025), *reh'g denied*, 145 S. Ct. 1323 (2025).

[27] Complaint ¶ 3.

database, including data for voters classified as 'private' and 'withheld'".[28] Mr. Lyman requested access to every Utah voter's "year of birth information" which is restricted under Utah law.[29] In the letter Mr. Lyman stated he was entitled to review the Utah voter rolls, despite Utah law forbidding private citizens from having access to these rolls, because the NVRA "as a federal enactment, supersedes and preempts Utah law."[30] Therefore, according to Mr. Lyman, "a denial of [his] request would violate the NVRA." Mr. Lyman alleges that Lt. Governor Henderson never responded to his letter.[31]

In October 2024, Mr. Lyman again wrote to the Lt. Governor's office, again seeking access to records pursuant to the NVRA.[32] On November 4, 2024, the Lt. Governor's office responded, directing Mr. Lyman to the office's website for access to the public version of the Utah voter roll. Regarding Mr. Lyman's request for portions of the Utah voter roll designated "private" or "withheld," the Lt. Governor's office stated that she "does not have discretion to ignore [the] state statute and provide unrestricted access to the state's voter rolls as [Mr. Lyman has] requested."[33] Mr. Lyman says he has yet to be provided with, or permitted to inspect, the portions of the Utah voter roll designated "private" or "withheld."[34]

Mr. Lyman subsequently retained the Public Interest Litigation Foundation ("PILF") as counsel.[35] On March 7, 2025, PILF allegedly sent a letter to the Lt. Governor's office stating that

---

[28] *Id*. ¶ 21.

[29] Id. ¶ 58.

[30] *Id*. ¶ 23.

[31] *Id*. ¶ 24.

[32] *Id*.

[33] *Id*. ¶ 26; Exhibit B to Complaint.

[34] *Id*. ¶ 26.

[35] *Id*. ¶ 27.

she was in violation of the NVRA "for failure to permit inspection of voter list maintenance records as required by 52 U.S.C. § 20507(i)."[36] PILF's letter gave the Lt. Governor 90 days to fulfill Mr. Lyman's request, "or a lawsuit would be filed against her" under 52 U.S.C. § 20510(b) of the NVRA.[37]

Neither PILF nor Mr. Lyman received a response from the Lt. Governor or any other person in her office following PILF's Letter.[38] To date, Mr. Lyman has not been given access to review portions of the Utah voter roll designated "private" or "withheld."[39] Mr. Lyman can see the portions of Utah's voter rolls designated "public" on the Lt. Governor's website.[40]

Mr. Lyman complains that he is injured, and continues to be injured, by the Lt. Governor's actions described above.[41] Mr. Lyman says he has exhausted all administrative remedies before pursing this litigation.[42] Mr. Lyman claims that he has satisfied the pre-litigation notice requirement provided under the NVRA.[43] Should he succeed in this litigation, Mr. Lyman states that he intends to use his access to the Utah voter rolls to pursue legal action to enforce the NVRA and "state voter list maintenance requirements."[44] Mr. Lyman states he "intends to use his findings to propose and promote best practices and solutions for specific and general voter list maintenance problems faced by election officials."[45]

---

[36] *Id*. ¶¶ 27-29; (*citing* the "Notice Letter," Exhibit C).

[37] *Id*.

[38] *Id*. ¶ 30.

[39] *Id*. ¶ 31.

[40] *Id*.

[41] *Id*. ¶ 36.

[42] *Id*. ¶ 25.

[43] *Id*. ¶ 33.

[44] *Id*. ¶ 3.

[45] *Id*. ¶ 3.

6

## 2   STANDARD OF REVIEW

Lt. Governor Henderson moves to dismiss Mr. Lyman's complaint under Fed. R. Civ. P. 12(b)(1)[46] for lack of subject-matter jurisdiction. A Rule 12(b)(1) motion to dismiss may take one of two forms: the motion may be a facial attack that "questions the sufficiency of the complaint;"[47] or, the motion may be a factual attack that "challenge[s] the facts upon which subject matter jurisdiction depends."[48] When a motion raises a facial challenge to the complaint, "a district court must accept the allegations in the complaint as true."[49] However, on a factual challenge, the court is not required to accept the complaint's allegations as true and "may not presume" that they are true.[50] A factual Rule "12(b)(1) motion is considered a 'speaking motion' and can include references to evidence extraneous to the complaint."[51] And a court enjoys "wide discretion to . . . resolve disputed jurisdictional facts."[52]

"Article III of the [United States] Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'"[53] "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."[54] "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'"[55] "This is the threshold question in

---

[46] Motion at 1.

[47] *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).

[48] *Id*.

[49] *Id*.

[50] *Id*. at 1003.

[51] *Wheeler v. Hurdman*, 825 F.2d 257, 259 n.5 (10th Cir. 1987).

[52] *Id*.

[53] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408, (2013).

[54] *Id*. (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).

[55] *Id*. (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)).

every federal case[.]"[56] Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation."[57] "For purposes of ruling on a motion to dismiss for want of standing . . . courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."[58]

"Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III."[59] "For standing purposes, therefore, an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law."[60] In other words, "under Article III, an injury in law is not an injury in fact."[61] "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions."[62] Thus, "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." [63]

---

[56] *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

[57] *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).

[58] *Seldin*, 422 U.S. at 501.

[59] *Laufer v. Looper*, 22 F.4th 871, 877 (10th Cir. 2022) (*quoting TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)).

[60] *Looper*, 22 F.4th at 877 (*quoting TransUnion*, 594 U.S. at 425).

[61] *Id*.

[62] *Id.* (quotations omitted).

[63] *Id*.

## 3    DISCUSSION

The parties positioned themselves on opposite sides of an apparent circuit split over NVRA standing.[64] The Lt. Governor urges alignment with the Third, Fifth, and Sixth Circuits, arguing that Mr. Lyman lacks standing because he cannot allege the "downstream consequences" that flow from an informational injury.[65] The Lt. Governor contends that the Tenth Circuit's holding in *Laufer v. Looper* reflects the same reasoning.[66] Mr. Lyman argues that those cases, and *Looper*, are distinguishable. He says his informational injury is akin to a FOIA injury and favors First Circuit precedent he says recognizes standing for informational injuries under the NVRA.[67]

Each side of the apparent circuit split is addressed below, along with *Looper*. The parties' supplemental briefing on *Torrez* has been considered. The precedent is clear: Mr. Lyman's informational injury, standing alone, does not establish NVRA standing.

### 3.1    A Statutory Right Does Not Automatically Create an Injury In Fact

The parties dispute whether Mr. Lyman may proceed. To resolve the standing question, this order proceeds in four steps: (1) whether the NVRA confers statutory standing and creates a private right of action; (2) whether any Tenth Circuit precedent governs; (3) how the Tenth Circuit's decision in *Torrez* informs that inquiry; and (4) how other circuits have addressed the same question and what guidance their reasoning offers here.

---

[64] Motion at 14-16; Opposition at 4-6.

[65] Reply at 2-5.

[66] *Id*. 1-3.

[67] Opposition at 11-13 (*citing Public Interest Legal Foundation, Inc. v. Bellows*, 92 F.4th 36, 48 (1st Cir. 2024)).

Though Lyman has statutory standing (an injury in law), that is insufficient to establish a concrete and particularized injury in fact sufficient to establish Article III standing (an injury in fact) for an NVRA claim. Statutory standing alone does not always add up to injury in fact.

### 3.1.1  A Private Right of Action Exists Under the NVRA.

The Tenth Circuit recently confirmed in *Torrez* that the NVRA provides a private right of action.[68] The NVRA expressly provides a private right of action:

**(b) Private right of action**

(1) A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved.

(2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

(3) If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).[69]

Neither party disputes that the statutory requirements have been met.[70] Therefore, accepting as true all material allegations of the complaint and construing the facts in favor of Lyman as non-movant,[71] the Complaint alleges sufficient facts to establish statutory standing.

### 3.1.2  An Asserted Informational Injury That Causes No Adverse Effects Cannot Confer Article III Standing.

The parties dispute which Supreme Court precedent governs standing under the NVRA. The Lt. Governor contends Mr. Lyman's complaint is "facially deficient because the allegations

---

[68] *Torrez*, 160 F.4th at 1078.

[69] 52 U.S.C. § 20510(b)(1-3).

[70] Motion at 6.

[71] *Seldin*, 422 U.S. at 501 .

10

fall short of meeting Plaintiff's burden to demonstrate a concrete and particularized injury in fact."[72] The Lt. Governor relies on *Spokeo, Inc. v. Robins* and *TransUnion, LLC v. Ramirez* as controlling authority.[73] Mr. Lyman counters that the NVRA's "standing framework originates with the federal Freedom of Information Act ("FOIA"),"[74] making his informational injury sufficient under *FEC v. Akins*[75] and *Public Citizen v. United States Dep't of Justice.*[76]

In both *Spokeo* and *TransUnion* the Supreme Court "rejected the proposition that 'a plaintiff automatically satisfies the injury in fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'"[77] Standing presents a threshold question of law that must first be addressed.[78]

"For Article III standing, a plaintiff must have (1) 'suffered an injury in fact,' (2) that is 'fairly traceable to the challenged action of the defendant,' and (3) that is likely to be 'redressed by a favorable decision.'"[79] An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."[80] "An asserted informational injury that causes no adverse effects cannot satisfy Article III."[81]

---

[72] Motion at 5-6.

[73] Motion at 3-6.

[74] Opposition at 2.

[75] Complaint ¶ 60 (*citing FEC v. Akins*, 524 U.S. 11, 21 (1998)).

[76] Opposition at 2 (*citing Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 449 (1989)).

[77] *TransUnion LLC v. Ramirez*, 594 U.S. 413, 414 (2021) (*quoting Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016), as revised (May 24, 2016)).

[78] *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 447 (10th Cir. 1996).

[79] *Laufer*, 22 F.4th at 876 (*citing Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

[80] *Id.*

[81] *TransUnion v. Ramirez*, 594 U.S. 413, 441 (2021).

The Lt. Governor cites the Tenth Circuit's decision in *Looper*.[82] In *Looper*, Ms. Deborah Laufer, a self-identified ADA "tester" from Florida, reviewed the Colorado Elk's Run Inn's online reservation system and sued alleging ADA violations.[83] Ms. Laufer stated she intended "in the near future" to "to test [the website] for compliance with 28 C.F.R. Section 36.302(e) and/or to utilize the system to reserve a guest room and otherwise avail herself of the goods, services, features, facilities, benefits advantages, and accommodations of the Property."[84] The district court dismissed for lack of Article III standing, and the Tenth Circuit affirmed. The Tenth Circuit, relying on *Spokeo* and *TransUnion*, held that Ms. Laufer lacked Article III standing because, "the Supreme Court explained that a statutory violation does not necessarily establish injury in fact." Ms. Laufer argued that she sustained an informational injury and therefore had standing under *Akins* and *Public Citizen*.[85] The Tenth Circuit rejected this argument, stating:

> The Supreme Court's recent decision in *TransUnion* shows why this argument fails. In that case the United States, participating as amicus, argued that the plaintiffs had suffered an "informational injury" under *Public Citizen* and *Akins* when TransUnion allegedly failed to provide them with required disclosures in a specified format under the FCRA. The Court rejected this argument in part because "the plaintiffs have identified no 'downstream consequences' from failing to receive the required information." "An asserted informational injury that causes no adverse effects cannot satisfy Article III."[86]

Here, the Lt. Governor argues that *Looper* is applicable because it shows "[t]he Tenth Circuit has rejected [Mr. Lyman's] reading of *Public Citizen* and *Akins*."[87] Mr. Lyman disagrees,

---

[82] *See* Reply at 3 (*quoting Looper*, 22 F.4th at 881 n.6 (10th Cir. 2022)).

[83] *Looper* at 874-75.

[84] *Id*. at 875.

[85] *Id*. at 880.

[86] *Id*. at 880-881.

[87] Reply at 5.

arguing that *Looper* is distinguishable because "[t]he [Tenth Circuit] was well aware of the *TransUnion* decision and interpreted it as being in accord with *Public Citizen* and *Akins*."[88]

Furthermore, his Opposition asserts "Mr. Lyman alleges exactly such an adverse effect" therefore distinguishing *Looper*.[89] The "downstream consequences" Mr. Lyman alleges to have incurred are: (1) the impaired ability to "study and analyze Utah's voter list maintenance programs and activities."; (2) the impaired ability to "assess Utah's enforcement of state and federal voter eligibility requirements."; and (3) the impaired ability to "assess Utah's compliance with voter list maintenance obligations."[90]

The Fourth Circuit in *Laufer v. Naranda Hotels, LLC*[91] held that Ms. Deborah Laufer (the same plaintiff who appeared in *Looper*) possessed Article III standing to sue a hotel owner for violations of the ADA's Hotel Reservation Regulation based solely on an alleged informational injury.[92] Ms. Laufer, acting again as a "tester," visited Naranda's website and discovered they failed to provide accessibility information required by law.[93] Ms. Laufer had no intention of booking a room at the hotel.[94] The Fourth Circuit analogized Ms. Laufer's injury to that of a Fair Housing Act tester in *Havens Realty Corp. v. Coleman*,[95] who possessed standing despite having no intention to rent an apartment because she had been denied "truthful information" to which she was statutorily entitled.[96] The Fourth Circuit reasoned that *Havens Realty* "squarely rejected

---

[88] Opposition at 11-12.

[89] *Id*. at 11-12.

[90] *Id*. at 8.

[91] *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156 (4th Cir. 2023).

[92] *Id.* at 166.

[93] *Id.* at 159–60.

[94] *Id*.

[95] *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374 (1982).

[96] *Naranda Hotels*, 60 F.4th at 166–67.

any . . . use requirement," holding that a tester's lack of intention to use services "does not negate the simple fact of injury."[97] The Fourth Circuit further emphasized that while plaintiffs in *Public Citizen* and *Akins* had articulated uses for withheld information, "those asserted uses were not a factor in the *Public Citizen* and *Akins* Article III standing analyses."[98]Accordingly, the Fourth Circuit vacated the district court's dismissal and remanded for further proceedings.[99]

The Fourth Circuit expressly disagreed with the *Looper's* reliance on *TransUnion* to impose a "downstream consequences" requirement.[100] In *Looper*, the Tenth Circuit interpreted *Public Citizen* and *Akins* to require plaintiffs to demonstrate "some relevance" by showing an intended use for withheld information beyond litigation.[101] The Fourth Circuit stated that *TransUnion* had distinguished rather than reinterpreted those precedents, differentiating information "received in the wrong format" from a complete "fail[ure] to receive any required information."[102] The Fourth Circuit observed that *Havens Realty* had "squarely rejected any . . . use requirement" of downstream consequences. The Fourth Circuit believed that while the *Public Citizen* and *Akins* plaintiffs had articulated uses for requested information, "those asserted uses were not a factor in the *Public Citizen* and *Akins* Article III standing analyses."[103]

Despite the disagreement between the Tenth Circuit in *Looper* and the Fourth Circuit in *Naranda*, involving the same plaintiff, the same statutes, and nearly identical facts, *Looper* is binding on district courts in the Tenth Circuit. This case does not invoke the Fair Housing Act,

---

[97] *Id.* at 172.

[98] *Id.*

[99] *Id.* at 175.

[100] *Id* at 172 n.7.

[101] *Looper*, 22 F.4th at 881.

[102] *Naranda Hotels*, 60 F.4th at 170.

[103] *Id.* at 172.

the ADA, racial animus, nor any form of discrimination. Mr. Lyman alleges a purely informational injury under the NVRA. Mr. Lyman chose to file this case in the Tenth Circuit where *Looper* controls. *Looper* requires plaintiffs alleging informational injuries to demonstrate that the withheld information has "some relevance" to them beyond the litigation itself.[104]

Mr. Lyman attempts to allege downstream consequences, but it makes no real difference. The consequences Mr. Lyman cites simply repackage his core claim: a desire to monitor and sue the Lt. Governor for alleged NVRA violations.[105] Therefore, like in *Looper*, Mr. Lyman merely seeks to see if the Lt. Governor's office follows the NVRA, which is no different than Ms. Laufer trying to see if the Elk's Run Inn followed the ADA.[106] The Tenth Circuit squarely rejected analogies to FOIA, instead holding that plaintiffs alleging informational injuries must demonstrate "some relevance" of the withheld information beyond the lawsuit itself and identify "downstream consequences" from the regulatory violation. [107]

Mr. Lyman himself has stated he has suffered an "informational injury."[108] Though Mr. Lyman has served as a county commissioner, state legislator, and gubernatorial candidate, all roles that under Utah law would have given him the information he now seeks,[109] he is now a private citizen seeking to oversee the Lt. Governor's NVRA compliance. Mr. Lyman alleges a statutory violation without an injury in fact. Under *Looper*, that is insufficient for Article III standing.

---

[104] *Looper*, 22 F.4th at 881.

[105] *Id*.

[106] *Looper*, 22 F.4th at 879.

[107] *Id*. at 877.

[108] Opposition at 1.

[109] Utah Code § 20A-2-104(4).

Mr. Lyman has not suffered a concrete injury sufficient to establish injury in fact, and he therefore lacks Article III standing.

### 3.1.3 The Supplemental Authority Informs Without Binding This Case.

The parties' successive supplemental briefs document how NVRA jurisprudence continues to develop nationally. Two cases are at the center of the supplemental briefs: (1) *Voter Reference Foundation, LLC v. Torrez*; and (2) *Public Interest Legal Found v. Adrian Fontes*. [110] Both cases have been reviewed and are discussed below. While each case examines the same out-of-circuit precedent at issue here, each is factually distinguishable.

#### 3.1.3.1 *Torrez* Does Not Support Mr. Lyman's Claim Because He Faces No Threat of State Enforcement and his Injury Is Solely Informational.

After the parties issued their respective briefs, the Tenth Circuit ruled on NVRA standing in *Voter Reference Foundation, LLC v. Torrez*.[111] The parties were ordered to provide supplemental briefing on *Torrez*.[112]

In *Torrez*, Voter Reference Foundation ("VRF") published New Mexico's voter data, received from the New Mexico Secretary of State's Office.[113] New Mexico's Secretary of State accused VRF of violating New Mexico's "Use Restrictions" and the "Data Sharing Ban," and referred VRF for criminal investigation and prosecution.[114] New Mexico's Attorney General then forwarded the referral to the FBI, and internal notes from the Secretary's Office recorded an instruction not to fulfill VRF's subsequent voter-data requests.[115] Facing a credible threat of

---

[110] *See* Lt. Governor's Supplement; *see also* Lyman's Supplement; *see also* Fontes Supplement; and Lyman's First Notice of Supplemental Authority, docket no. 35, filed December 4, 2025.

[111] *Torrez*, 160 F.4th at 1.

[112] Docket Text Order, docket no. 36, filed December 5, 2025.

[113] *Id*.

[114] *Id*. at 2.

[115] *Id*. at 3.

16

prosecution, VRF removed the New Mexico voter data from its website and refrained from further publication despite a stated desire to continue doing so.[116]

VRF issued formal notice under the NVRA identifying the refusal to disclose voter data as a statutory violation, but the Secretary did not cure the violation within the NVRA's required timeline.[117] VRF sued asserting five First and Fifth Amendment claims and sought a preliminary injunction to prevent New Mexico from prosecuting it under the Election Code or restricting its use and publication of voter data.[118] The district court granted VRF's motion for preliminary injunction, which was stayed by the Tenth Circuit.[119] After a one-day bench trial, the district court found the State's refusal to provide voter data was unconstitutional viewpoint discrimination and enjoined the State from enforcing the "Use Restrictions" and the "Data Sharing Ban," against VRF.[120] The State appealed.

Though standing was not raised by either party on appeal, the Tenth Circuit discussed it.[121] The Tenth Circuit observed that the State submitted supplemental authority, relying on *PILF v. Sec'y Commonwealth of Pa.*[122] and *Benson*[123] to contend that VRF lacked standing.[124] The Tenth Circuit distinguished those cases, stating:

> In those cases, plaintiffs had not alleged an injury in fact because they could not show that the unlawful denial of record requests caused a concrete downstream injury . . . But VRF's claim does not rest on an informational injury; it rests on the statute's chilling effect. VRF faces possible criminal investigation and

---

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] *Id.* at 4.

[120] *Id.* at 5.

[121] *Id.* at 1078.

[122] *Id.* (*citing Sec'y Commonwealth of Pa.*, 136 F.4th at 465–69).

[123] *Id.* (*citing Benson*, 136 F.4th at 629).

[124] *Id.* at 5.

prosecution based on the Secretary's criminal referral letter to the Attorney General and FBI, indicating that VRF's conduct is proscribed by New Mexico's Election Code. [125]

Due to the threat of criminal prosecution, the Tenth Circuit found that VRF had standing.[126]

Here, both parties agree that *Torrez* "does not address standing in this case."[127] The Lt. Governor affirms "*Torrez* is of no help to Plaintiff here."[128] Mr. Lyman states that the injury in *Torrez* is "wholly dissimilar from Mr. Lyman's injury and so has no bearing on the pending motion to dismiss."[129] After distinguishing the facts of *Torrez*, Mr. Lyman distinguishes the holding of *Torrez*:

> *Torrez* did not address whether the denial of a public records request constitutes a concrete injury under Article III. That question was not presented by the facts before the court, and the Tenth Circuit appropriately did not decide it. *Torrez* involved a wholly different and unrelated injury than the one alleged here.[130]

Finally, both parties spotted the Tenth Circuit's carve out in *Torrez* for informational injuries[131] when the Tenth Circuit stated, "VRF's claim does not rest on an informational injury; it rests on the statute's chilling effect." [132] Mr. Lyman himself has admitted the facts of his case are distinguished from *Torrez*.[133] Therefore, the calculus is straightforward. Both parties agree *Torrez* is distinguished because Mr. Lyman has alleged only an informational injury, and the Tenth Circuit itself carved out informational injuries from *Torrez*'s reach. *Torrez* does not apply.

---

[125] *Torrez*, 160 F.4th at 1078.

[126] *Id*. at 6.

[127] Lyman's Supplement at 2.

[128] Lt. Governor's Supplement at 5.

[129] Lyman's Supplement at 1.

[130] *Id*. at 4.

[131] *Compare* Lt. Governor's Supplement at 1 *and* Lyman's Supplement at 2 *referencing Torrez*, 160 F.4th at 1068.

[132] *Torrez*, 160 F.4th at 1078.

[133] Lyman's Supplement at 2-3.

18

The parties do not dispute[134] that the Tenth Circuit's holding in *Torrez* is consistent with *Looper.* The viewpoint discrimination presented in *Torrez* meets the "concrete interest" or "injury in fact" that the Tenth Circuit stated in *Looper* is necessary to establish standing post-*TransUnion.*[135] Therefore, *Torrez* represents a narrower holding in the NVRA context that builds on *Looper*: a credible claim of viewpoint discrimination establishes a concrete injury in fact, and when paired with the NVRA's private right of action, a party has standing to sue. Absent impairment of a concrete interest, however, an informational injury alone is insufficient to confer standing under the NVRA.

Both *Looper* and *Torrez* show that not all statutory rights create a concrete harm, and that standing under the NVRA requires more than a mere informational injury.

3.1.3.2        *Fontes* Informs Without Governing This Case.

After briefing closed, after the Tenth Circuit's *Torrez* decision, but before this order was issued, another NVRA ruling emerged from the District of Arizona in *PILF v. Fontes.*[136] In *Fontes*, PILF who serves as counsel for Mr. Lyman in this case, requested all Electronic Registration Information Center ("ERIC") Retraction Reports and related correspondence from Arizona Secretary of State Adrian Fontes under the NVRA.[137] Secretary Fontes moved to dismiss for failure to state a claim, arguing PILF lacked standing under *TransUnion.*[138] PILF countered, as it does here, that *Public Citizen* and *Akins* confer standing.[139]

---

[134] *Compare* Lt. Governor's Supplement at 1; *and* Lyman's Supplement at 2.

[135] *Compare Looper*, 22 F.4th at 879 *with Torrez*, 160 F.4th at 1068.

[136] *Public Interest Legal Foundation v. Fontes*, No. CV-25-02722-PHX-MTL, 2026 WL 45037 (D. Ariz. Jan. 5, 2026).

[137] *Id*. at *1.

[138] *Id*. at *2.

[139] *Id*. at *3.

The district court denied the motion to dismiss. First, Judge Liburdi rejected PILF's reliance on *Public Citizen* and *Akins,* applied *TransUnion* instead, and held "[b]ecause [PILF] alleges an informational injury, it must also show a nexus between the downstream consequence, the alleged harm, and the concrete interest Congress sought to protect."[140] Second, Judge Liburdi found PILF's alleged downstream consequences sufficient for standing. In coming to that determination Judge Liburdi distinguished all out-of-circuit precedent[141] and applied binding Ninth Circuit precedent, most notably *Mi Familia Vota v. Fontes*.[142] In *Mi Familia Vota*, the Ninth Circuit held that plaintiffs had standing to request the same records PILF sought, against the same Arizona Secretary of State, under the same NVRA provisions.[143] Bound by that precedent, Judge Liburdi ruled PILF's downstream consequences established standing.[144]

*Fontes* informs without governing. Judge Liburdi applied *TransUnion*, distinguished out-of-circuit precedent, and followed binding circuit authority. This order does the same but reaches a different result. Geography determines the outcome. While Judge Liburdi could distinguish *Looper* and was bound by *Mi Familia Vota*, the opposite holds true here. In the Tenth Circuit, *Looper* binds and *Mi Familia Vota* persuades at most. As discussed above, *Looper* mandates dismissal.

---

[140] *Id*.

[141] *Id*. (*distinguishing Scott*, 49 F.4th at 938; *Looper*, 22 F.4th at 881; *Benson*, 136 F.4th at 630 n.11; *Sec'y of Pa.*, 136 F.4th at 466).

[142] *Id*. (*citing Mi Familia Vota v. Fontes*, 129 F.4th 691, 717 (9th Cir. 2025)).

[143] *Mi Familia Vota*, 129 F.4th at 710-715.

[144] *Fontes*, No. CV-25-02722-PHX-MTL, 2026 WL 45037 at *4-5.

### 3.1.4 Circuit Courts Agree That After *TransUnion* an Informational Injury Without Downstream Consequences Does Not Establish Standing.

It appears at first glance that the parties have taken opposite sides of a circuit split arising post-*TransUnion*. The Lt. Governor favors the Fifth, Third, and Sixth Circuits as the "three federal courts of appeals [that] have rejected '[information injury as sufficient for Article III standing] in NVRA cases."[145] Mr. Lyman praises the First Circuit's position in *Public Interest Legal Fund v. Bellows*[146] and asserts that "Courts across the country have recognized that statewide registration lists fall squarely within this statutory mandate."[147] A closer look reveals no split at all, and instead the circuits apply a single rule: if there is no threat of state enforcement, there is no injury in fact.

After *TransUnion* was decided in 2021, the Fifth Circuit was the first to address standing under the NVRA in 2022 in *Campaign Legal Center v. Scott*.[148] In *Scott*, Campaign Legal Center identified more than 11,000 registered voters in Texas as potential non-citizens based on Texas Department of Public Safety records.[149] Campaign Legal Center wrote to the Texas Secretary of State for voter-specific information to evaluate the accuracy of the Texas's electoral process.[150] The Texas Secretary of State refused to disclose the requested records. Campaign Legal Center sued under the NVRA alleging that Texas had unlawfully withheld information the NVRA requires to be made available for public inspection. The district court, after determining that there was standing to bring the case, issued an injunction requiring the State of Texas to provide

---

[145] Reply at 3 (*citing Sec'y Commonwealth of Pa.*, 136 F.4th at 456; *Scott*, 49 F.4th at 931; *Benson*, 136 F.4th at 613).

[146] *Bellows*, 92 F.4th at 54.

[147] Opposition at 13 (*citing Bellows*, 92 F.4th at 47).

[148] 49 F.4th at 931.

[149] *Id*. at 934.

[150] *Id*.

21

information requested.[151] On appeal the Fifth Circuit reversed, holding that after *TransUnion,* the

Campaign Legal Center did not have standing.[152] The Fifth Circuit analyzed Supreme Court

precedent:

> Even if Plaintiffs had a right to the records sought, an issue we do not reach, they have not established an injury in fact. *Spokeo* implied and *TransUnion* held that "under Article III, an injury in law is not an injury in fact." *TransUnion* generally rejected the Attorney General's advocacy for an unlimited "informational injury" approach to standing, in part by explaining that "the plaintiffs have identified no 'downstream consequences' from failing to receive the required information.'" As this court recently observed, *TransUnion* rejected "the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'"[153]

The Fifth Circuit applied this analysis to Campaign Legal Center's claims for standing.[154]

Campaign Legal Center argued a statutory right to the "visibility" of the Texas's process, to

which they were denied. The Fifth Circuit stated this was not enough, because "absent concrete

and particularized harm to [Campaign Legal Center] from not obtaining the requested personal

voter information, they assert no cognizable injury in fact."[155] The Fifth Circuit reversed and

remanded with instructions to dismiss the case.[156]

Following *Scott*, the Third and Sixth Circuits adopted the same basic rule: "failure to

articulate specific downstream consequences demonstrates [a failure] to show a sufficient injury

to confer Article III standing."[157] In *Sec'y Commonwealth of Pa.*, PILF, which represents Mr.

Lyman here, sent multiple letters to Pennsylvania's Secretary of the Commonwealth after the

---

[151] *Id*. at 932.

[152] *Id*. at 939.

[153] *Id*. at 937.

[154] *Id*.

[155] *Id*.

[156] *Id*. at 939.

[157] *Benson*, 136 F.4th at 632.

22

Secretary disclosed that a "glitch" in a state computer system had allowed ineligible persons to register to vote while applying for or renewing driver's licenses or vehicle registrations.[158] Though the Secretary gave PILF some records, all the records requested were not provided and PILF filed suit.[159] On appeal, PILF argued, as they do here, that *Public Citizen* and *Akins* govern standing under the NVRA.[160] The Sixth Circuit disagreed, stating as follows:

> One can dispute whether *TransUnion* raised the bar in terms of the adverse consequences that must be alleged to satisfy the standing requirements in different statutory settings . . . [b]ut it set the standard we must follow. And under the Supreme Court's standard, statutory context is important. Here, as in *TransUnion*, we are presented with a statute with a purpose that goes farther than government transparency such as FOIA. The required disclosure of certain records is merely one aspect of the statutory scheme in service of a greater purpose—that is, as we explain below, *the expansion of voter participation in federal elections.*[161]

The Sixth Circuit applied *TransUnion*, vacated the District Court's orders, and remanded with instructions to the District Court to dismiss the case.[162]

In *Benson* (in the Sixth Circuit), PILF sent multiple letters to the Michigan Secretary of State regarding deceased registrants on the active voter rolls.[163] After not getting the results they wanted, PILF filed suit under the NVRA to obtain voter rolls in Michigan.[164] On appeal, the Sixth Circuit specifically noted that PILF had raised identical arguments before the Third Circuit, and called the arguments "unavailing."[165] The Sixth Circuit noted that the Third Circuit found

---

[158] *Sec'y Commonwealth of Pa.*, 136 F.4th at 459.

[159] *Id*. at 460.

[160] *Id*. at 462.

[161] *Id*. at 463.

[162] *Id*. at 470.

[163] *Benson*, 136 F.4th at 632.

[164] *Id*. at 632 (*citing Sec'y Commonwealth of Pa.*, 136 F.4th at 468).

[165] *Id*. at 631.

PILF "failed to identify some *specific* adverse downstream consequence for its mission or future plans." The Sixth Circuit followed the Third and the Fifth and rejected PILF's arguments.[166]

Though PILF failed in the Third and Sixth Circuits, they prevailed before the First Circuit in *Bellows*.[167] PILF requested Maine's voter roll under the NVRA, and acknowledged that a state statutory exception barred PILF's intended uses.[168] Maine's Deputy Secretary of State denied the request, stating she lacked authority to release the file, and PILF sued.[169] While the case was pending, the Maine Legislature adopted a new statutory exception, which allowed access for voter-list-maintenance review but imposes civil penalties of up to $1,000 for misuse.[170]

On appeal, Maine argued that PILF lacked standing because the State would not treat PILF's conduct as a violation.[171] The First Circuit rejected that position, holding that Maine's position was not "nonenforcement" but that "these statements [of the Secretary of State to refrain from prosecution] do not have the force of law and are not binding on future officeholders."[172] In other words, because PILF still faced a possibility of enforcement under the new state exception from a different administration, the First Circuit held that PILF had standing.[173]

The out-circuit-cases use legal reasoning consistent with Tenth Circuit precedent. The holdings from the Fifth, Third, and Sixth Circuits found no standing for cases that only presented an informational injury. This is exactly what the Tenth Circuit stated in *Looper*: "an injury in law

---

[166] *Id*. at 632 (*citing Sec'y Commonwealth of Pa.*, 136 F.4th at 469).

[167] *Bellows*, 92 F.4th 36.

[168] *Id*.at 43.

[169] *Id*.

[170] *Id*.

[171] *Id*. at 50.

[172] *Id*.

[173] *Id*. at 50-51.

24

is not an injury in fact."[174] The First Circuit, and now the Tenth Circuit in *Torrez*, found a party had standing when there was the threat of either civil or criminal enforcement. The circuits are not in conflict.

Mr. Lyman concedes that his only injury is informational,[175] and nothing in the record shows any threat that Utah may enforce its laws against Mr. Lyman through civil penalties or criminal prosecution. Mr. Lyman has not alleged any threat of civil enforcement by the Lt. Governor, and none appears in the Lt. Governor's filings. Without a real enforcement risk, *Torrez* and *Bellows* do not support a finding of standing. The simple rule is this: if there is no threat of state enforcement, there is no injury in fact. The persuasive holdings in *Benson*, *Scott*, and *Secretary of Pennsylvania*, along with the binding rule in *Looper*, make clear that informational injuries alone cannot establish standing under the NVRA after *TransUnion*. Granting the Lt. Governor's Motion to Dismiss is therefore appropriate.

## 4   CONCLUSION

Mr. Lyman has satisfied the NVRA's statutory prerequisites for suit, but statutory violation does not provide Article III standing. Article III requires more than a statutory right and an informational injury; it demands a concrete harm. The Supreme Court made this clear in *TransUnion*, and the Tenth Circuit has applied that rule in both *Looper* and *Torrez*. Mr. Lyman only wants information to monitor the Lt. Governor's compliance with the NVRA. He faces no threat of prosecution; no civil penalty; no viewpoint discrimination; and no adverse consequence beyond being denied access to data he seeks. That is no more than an informational injury, Mr. Lyman falls short of Article III's threshold requirement. Without a concrete harm; enforcement

---

[174] *Looper*, 22 F.4th at 877 (*quoting TransUnion*, 594 U.S. at 425).

[175] Opposition at 2.

risk; chilling effect; or tangible downstream harm, there is no case or controversy. Mr. Lyman's

claimed injury is admittedly entirely informational, and under controlling authority, that is

insufficient. The Lt. Governor's Motion to Dismiss is therefore GRANTED.

## 5    ORDER

IT IS HEREBY ORDERED that the Lt. Governor's Motion to Dismiss[176] is GRANTED.

IT IS FURTHER ORDERED that:

1.      Mr. Lyman's Motion for Summary Judgment[177] is FOUND MOOT.

2.      Lt. Governor's Motion for Relief funder Federal Rule of Civil Procedure 56(d)[178]

        is FOUND MOOT.

3.      The Clerk of Court is ordered to CLOSE THE CASE.

Signed January 14, 2026.


                                BY THE COURT

                                _____
                                David Nuffer
                                United States District Judge

---

[176] Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1), docket no. 18, filed August 4, 2025.

[177] Lyman's Motion for Summary Judgment, docket no. 17, filed July 29, 2025.

[178] Motion for Relief under Federal Rule of Civil Procedure 56(d), docket no. 33, filed November 24, 2025.

26

# Addendum B

Judgment, Case No. 4:25-cv-00069-DN-PK (01/15/2026)

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| PHIL LYMAN, <br><br>                Plaintiff, <br><br> v. <br><br> DEIDRE HENDERSON, in her official capacity as Lt. Governor of the State of Utah, <br><br>                Defendant. | **JUDGMENT IN A CIVIL CASE** <br><br> Case No. 4:25-cv-00069-DN-PK <br><br> District Judge David Nuffer |

IT IS ORDERED AND ADJUDGED as explained in the Memorandum Decision and

Order Granting Defendant Lieutenant Governor Deidre Henderson's [18] Motion to Dismiss

Pursuant to Fed. R. Civ. P. 12(b)(1), that Lt. Governor Deidre Henderson's Motion to Dismiss

Pursuant to Fed. R. Civ. P. 12(b)(1) [1] is GRANTED.

IT IS FURTHER ORDERED that:

1.      Mr. Lyman's Motion for Summary Judgment[2] is FOUND MOOT.

2.      Lt. Governor's Motion for Relief funder Federal Rule of Civil Procedure 56(d)[3] is

        FOUND MOOT.

---

[1] Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1), docket no. 18, filed August 4, 2025.

[2] Lyman's Motion for Summary Judgment, docket no. 17, filed July 29, 2025.

[3] Motion for Relief under Federal Rule of Civil Procedure 56(d), docket no. 33, filed November 24, 2025.

3.      The Clerk of Court is directed to CLOSE THE CASE.

Signed January 14, 2026.

BY THE COURT

_____
David Nuffer
United States District Judge